ISHEE, J.,
 

 for the Court.
 

 ¶ 1. Reginald Anderson was convicted on June 10, 2004, in the Leflore County Circuit Court for two counts of aggravated assault and one count of possession of a firearm by a convicted felon. He was sentenced as a habitual offender to twenty years for each count of aggravated assault and three years for possession of a firearm by a convicted felon, with all sentences to run concurrently in the custody of the Mississippi Department of Corrections. Aggrieved, Anderson appeals, assigning the following issues for review:
 

 I. Whether the trial court erred by allowing the State to refer to Anderson as a “thug” during voir dire.
 

 II. Whether the trial court erred in failing to require the State to provide race-neutral reasons for using peremptory strikes against African American jurors.
 

 III. Whether the trial court erred by admitting improper hearsay testimony.
 

 IV. Whether the trial court erred by granting two “flight” jury instructions.
 

 Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On December 15, 2002, Tremaine Butts, Lucas Smith, and Tarvis Kinds were riding down McLaurin Street in Greenwood, Mississippi in a car owned by Butts’s grandfather. Butts drove the car; Smith sat in the passenger seat, and Kinds sat in the backseat. According to Butts, he pulled the car up to a local establishment known as Little David’s Place where a crowd of people had gathered outside. One of those people in the crowd was Anderson. Anderson was not a stranger to Butts’s passengers. Smith was the first to alert the group of Anderson’s presence stating, “There goes Red.” According to Smith, he knew Anderson because the two
 
 *909
 
 had attended school together. Kinds was also familiar with Anderson. Only a few hours earlier, the two were involved in an altercation outside of a local food mart where Kinds had punched Anderson in the face.
 

 ¶ B. Shortly after pulling up to Little David’s Place, the group noticed the crowd part and watched as Anderson walked to a gold car and returned with a shotgun. Smith, noting that there was trouble brewing, urged Butts to put the car in reverse and back down the street. However, Butts admitted that he panicked when he saw the gun and mistakenly put the car in drive. According to the three men, as the car began to move forward, Anderson approached and fired the shotgun multiple times into the car. Smith and Butts were struck by the gunshots, while Kinds only received a graze wound to the hand.
 

 ¶ 4. After the shooting, officers with the Greenwood Police Department checked Anderson’s residence, as well as the neighborhoods and other different locations where he was known to be seen. Despite them efforts, the police were unable to apprehend Anderson and received word that he had skipped town and gone to Tennessee. Three months had passed when officers received another tip that Anderson was back in Greenwood and living in a house at “Broad and Avenue K.” On March 6, 2003, a tactical team was sent to the location where they found Anderson hiding under the house.
 

 ¶ 5. Anderson was arrested and indicted on two counts of aggravated assault and one count of possession of a firearm by a convicted felon. His trial began on June 9, 2004. During the course of voir dire, the prosecutor asked the venire panel, “If it should come up, maybe this case is a case where a thug is shooting a thug ... [w]ould anybody say right now that T will not vote guilty on a case where it’s just thugs shooting thugs?’ ” Anderson’s counsel objected to the characterization of Anderson as a “thug.” The prosecutor argued that he was merely giving a hypothetical situation since the proof might show that the parties involved were “thugs.” The trial judge allowed the prosecutor to continue his line of questioning without further objections from Anderson’s counsel. The trial judge, however, stopped the prosecutor when a member of the panel asked him to define “thug.” In response, the trial judge asked that the panel members set aside their feelings and follow the instructions given by the trial court.
 

 ¶ 6. After the completion of voir dire, the trial judge excused the venire panel so that the parties could exercise their strikes and pick a jury in chambers. The prosecutor made six peremptory challenges that were not objected to by Anderson. The challenges were accepted by the trial court, and the venire panel was turned over to Anderson. Anderson also made six peremptory challenges. In doing so, he struck five white jurors from the jury. The State responded to the strikes by making a reverse
 
 Batson
 
 challenge, claiming that the strikes were based on race. The trial court noted that the defense had used its last four strikes, and five out of its six strikes were used to strike white jurors in a jury pool that was predominantly black. The trial court found a prima facie case under
 
 Batson
 
 and required Anderson’s counsel to provide race-neutral reasons for his strikes. After Anderson’s counsel provided race-neutral reasons for each strike, the trial judge found the strikes to be acceptable. Subsequently, Anderson’s attorney attempted to make a
 
 Batson
 
 challenge to the prosecutor’s strikes even though he had failed to object to them originally. The trial judge considered the racial make-up of the venire panel
 
 *910
 
 as a whole and held that because it was predominantly black, there was no prima facie case made that the prosecutor’s peremptory challenges were based solely on race. Therefore, he denied Anderson’s motion for a
 
 Batson
 
 hearing and proceeded with the trial.
 

 ¶ 7. Among the witnesses called by the State at trial were Sergeant Lawrence Williams and Sergeant Jerome McCaskill of the Greenwood Police Department who both investigated the shooting. Sergeant Williams testified that as part of his investigation he interviewed Butts, Smith, and Kinds. Smith told Sergeant Williams that “Red” Anderson shot him, while Butts and Kinds identified the shooter as Reginald Anderson. Sergeant Williams stated that he believed “Red” and Reginald Anderson to be the same person. To be sure, he compiled a photographic lineup containing six photographs that he showed to Smith. After examining the lineup, Smith identified Reginald Anderson as the shooter. Sergeant Williams’s testimony was later corroborated by that of Butts, Smith, and Kinds when they each took the stand and positively identified Anderson as their assailant. After identifying Anderson as a suspect, Sergeant Williams stated that the police were unable to determine Anderson’s whereabouts. Based on a confidential informant tip, the police learned that Anderson had fled from the state. Sergeant McCaskill testified that he received a second tip from a confidential informant in March 2003 that Anderson was back in Greenwood. When the police went to the residence where Anderson was believed to be staying, they found him hiding underneath the house.
 

 ¶ 8. Anderson testified on his own behalf, and he was the only witness called by the defense. Though he admitted that he was near the scene just before the shooting, he denied any specific involvement. He also admitted that he was punched in the face by Kinds earlier in the day. When asked why he hid under his house on the day of his arrest, Anderson stated:
 

 So I was scared because I was already convicted when I was 15. I had got arrested for drugs, for selling drugs. And about three years after that, I had got caught with a firearm....
 

 So I was afraid. I didn’t know what to do. So I said, “I ain’t got no money to get out of jail.” You know, so the day the police came to my house, I know I ain’t have no money to make bond, and I didn’t want to go to jail....
 

 So somebody knocked on my door and said, “Red, the police coming.” So I jumped out of the house, and I hid up under the house because I was afraid....
 

 ¶ 9. At the close of trial, the jury found Anderson guilty on all three counts for which he was charged. Anderson was sentenced as a habitual offender to twenty years on each count of aggravated assault and three years for possession of a firearm by a convicted felon. Each sentence was set to run concurrently in the custody of the MDOC. Anderson filed a motion for a judgment notwithstanding the verdict and a motion for a new trial or to amend the verdict. The motions were denied.
 

 DISCUSSION
 

 I. Whether the trial court erred by allowing the State to refer to Anderson as a “thug” during voir dire.
 

 ¶ 10. Anderson contends that the trial court erred by overruling his objection to certain remarks made by the prosecutor to the venire panel during voir dire. Specifically, he objects to the prosecutor asking the question, “[wjould anybody say right now that T will not vote
 
 *911
 
 guilty on a case where it’s just thugs shooting thugs?’ ” Anderson argues that such a question was improper and had the effect of influencing the jury, which denied him his fundamental right to a fair trial.
 

 ¶ 11. It is well established that during voir dire the prosecutor has a duty “to make such inquiries as would insure that the jurors would be fair and impartial to the defendant as well as to the State’s case.”
 
 Myers v. State,
 
 268 So.2d 353, 355 (Miss.1972) (citing
 
 McCaskill v. State,
 
 227 So.2d 847, 852 (Miss.1969)). “In passing upon the extent and propriety of questions addressed to prospective jurors, the trial court has considerable discretion.”
 
 Id.
 
 This Court will not reverse unless it is shown that the trial court abused its discretion.
 
 Davis v. State,
 
 684 So.2d 643, 652 (Miss.1996). Abuse of discretion will only be found where a defendant shows he or she was clearly prejudiced by the prosecutor’s comments.
 
 Id.
 

 ¶ 12. Anderson argues that there are two faults with the prosecutor’s question in this case. First, he argues that the prosecutor asked the jury to commit to a certain verdict in violation of Rule 3.05 of the Uniform Rules of Circuit and County Court. Second, he claims that the word “thug” is invective and was only used to prejudice the jury pool against him. The State maintains that the prosecutor’s question during voir dire was proper because it was used to address the possibility that, due to the character of the parties involved, the prospective jurors might fail to convict even if the evidence proved Anderson to be guilty.
 

 ¶ 13. Under Uniform Rule of Circuit and County Court 3.05, the posing of hypothetical questions to the venire panel during voir dire, which requires a juror to pledge a particular verdict, is prohibited. Specifically, this Court has stated that attorneys are prohibited “from attempting to elicit promises from the jury promising that under a hypothetical set of circumstances, they will return a specific verdict.”
 
 Robinson v. State,
 
 726 So.2d 189, 191— 92(¶ 6) (Miss.Ct.App.1998) (citing
 
 West v. State,
 
 553 So.2d 8, 21-22 (Miss.1989)). However, “[a] hypothetical question does not create per se reversible error where the prosecutor does not ‘specifically request a verdict during voir dire.’ ”
 
 Id.
 
 (quoting
 
 Holland v. State,
 
 705 So.2d 307, 339 (¶ 116) (Miss.1997)).
 

 ¶ 14. Ascertaining whether jurors are capable of returning a specific verdict differs greatly from requiring them to pledge a specific verdict under a hypothetical question. The record does not indicate any statements or questions by the prosecution requiring the venire panel to pledge a specific verdict. The prosecutor never specifically asked the venire panel to pledge a guilty verdict, nor did he say that the venire panel was required to vote guilty based on the facts and circumstances of the case. Instead, the prosecutor merely asked if the jurors were capable of returning a guilty verdict regardless of whether or not they perceived Anderson and the victims to possess certain character flaws. Therefore, we find no fault in the prosecutor’s use of a hypothetical question during voir dire.
 

 ¶ 15. However, this Court must acknowledge, as a general principle, that we are very critical of a prosecutor’s decision to refer to a defendant, victim, or any other party to a criminal prosecution as a “thug.” Such language inherently increases the danger that the jury will be prejudiced against that party. Nevertheless, our standard of review requires this Court to determine if Anderson was clearly prejudiced by the prosecutor’s comments. After careful review of the record, we find that Anderson was clearly not prejudiced. Had the prosecutor used similar language
 
 *912
 
 during closing argument as an attempt to plant a seed in the mind of the jury immediately before deliberation the danger for prejudice would be more obvious. However, we are not charged with deciding such an issue in this case. We must keep in mind that the prosecutor’s comments were made during the course of voir dire and for the purpose of determining whether the prospective jurors would be capable of returning a verdict regardless of their opinion of the character of all parties involved. Therefore, the likelihood that Anderson would be clearly prejudiced by the prosecutor’s comments was remote.
 

 ¶ 16. We also find that any prejudice created by the prosecutor’s question was rehabilitated by both the trial judge and Anderson’s attorney prior to the'completion of voir dire. Specifically, the trial judge cut off the prosecutor’s line of questioning when a prospective juror inquired into the prosecutor’s definition of “thug.” In doing so, the trial judge reminded the venire panel that they were to set aside their personal feelings and follow the instructions given by the trial court. When the venire panel was turned over to Anderson, his attorney questioned the jurors about Anderson’s presumption of innocence. Specifically, he stated:
 

 Now, seeds may be planted here in voir dire, seeds may be planted in an opening statement.... People have been called thugs in here this morning. Those are seeds being planted in your mind. Do you understand that that is not evidence, and that you can’t base your decision on what [the prosecutor] says? Will everyone agree with me that this is a great country, that you are presumed innocent until you are proven guilty?
 

 Each of the prospective jurors responded affirmatively. They responded affirmatively again when asked whether they understood that Anderson was to be “presumed innocent until proven guilty beyond a reasonable doubt by the State.... ” Further, the jury was instructed again by the trial judge prior to deliberations that “[a]r-guments and remarks of the attorneys in this case are intended to help you understand the evidence and apply the law, but such arguments and remarks are not evidence.” We presume that jurors follow the instructions of the court relative to their conduct during the course of a trial.
 
 Lattimore v. State,
 
 958 So.2d 192, 203(¶ 37) (Miss.2007) (quoting
 
 Weaver v. State,
 
 272 So.2d 636, 638 (Miss.1973)).
 

 ¶ 17. Accordingly, the trial judge did not abuse his discretion by allowing the prosecutor’s question. This issue is without merit.
 

 II. Whether the trial court erred in failing to require the State to provide race-neutral reasons for using peremptory strikes against African American jurors.
 

 ¶ 18. Anderson contends that the State exercised its peremptory strikes on six African American jurors in a racially motivated manner, and the trial court erred by not requiring the State to provide race-neutral reasons for each strike after he made his
 
 Batson
 
 challenge. However, Anderson’s
 
 Batson
 
 challenge was not made in a timely manner. The record reveals that it came only after the venire panel was turned over to Anderson, and he was faced with a reverse
 
 Batson
 
 challenge by the State, which required Anderson to provide race-neutral reasons for striking five white jurors. There is nothing in the record that suggests Anderson objected to the State’s peremptory strikes at the time that they were made. Rule 4.05(B) of the Uniform Rules of Circuit and County Court provides that “[constitutional challenges to the use of peremptory challenges shall be made at the time each panel is tendered.” There
 
 *913
 
 fore, Anderson was required to make his
 
 Batson
 
 challenge immediately after the State exercised its peremptory strikes. His failure to do so procedurally bars this issue for review. Failure to make a contemporaneous objection waives an issue for purposes of appeal.
 
 Spicer v. State,
 
 921 So.2d 292, 305(¶22) (Miss.2006). Notwithstanding the untimeliness of Anderson’s objection, his argument still fails because he did not make a prima facie case that the prosecutor’s challenges were motivated by race.
 

 ¶ 19. We must give great deference to the trial court’s determinations under
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), because such determinations are largely based on credibility.
 
 Gibson v. State,
 
 731 So .2d 1087, 1095(¶ 23) (Miss.1998) (citing
 
 Coleman v. State,
 
 697 So.2d 777, 785 (Miss. 1997)). In the context of
 
 Batson,
 
 “great deference” means we will not reverse the trial court unless its decision is clearly erroneous.
 
 Id.
 
 (quoting
 
 Lockett v. State,
 
 517 So.2d 1346,1349-50 (Miss.1987)).
 

 ¶ 20. A party objecting to the use of peremptory challenges under
 
 Bat-son
 
 must make a prima facie case showing that the striking party exercised its peremptory challenges on the basis of race.
 
 Id.
 
 at (¶ 24). To present that prima facie case, the objecting party must demonstrate that: (1) he or she is a member of a “cognizable racial group”; (2) the striking party exercised his or her peremptory challenges toward the elimination of venire persons of his or her race; and (3) facts and circumstances raised an inference that the striking party used his or her peremptory challenges for the purpose of striking minorities from the venire.
 
 Id.
 
 If the objecting party presents a prima facie case under
 
 Batson,
 
 the burden then shifts to the striking party, who may rebut that prima facie case by a demonstration of race-neutral reasons for his exercise of peremptory challenges.
 
 Id.
 
 If the striking party offers a race-neutral explanation, the objecting party may rebut the explanation.
 
 Id.
 

 ¶ 21. As previously stated, the burden rested solely on Anderson to present a prima facie case that the prosecutor exercised his peremptory challenges on the basis of race before a
 
 Batson
 
 hearing was necessary. Though Anderson was able to meet the first two requirements, he failed to show that the facts and circumstances of this case raised an inference that the prosecutor used his peremptory challenges for the sole purpose of striking black jurors from the venire. The only argument offered by Anderson was that the prosecutor’s challenges must have been racially motivated because all six were used on black jurors. However, the record reflects that Anderson, as well as both of the aggravated assault victims, are black. Therefore, race was not directly nor inferentially an issue in the underlying trial. Further, as acknowledged by both the State and Anderson, the venire pool was predominately black. The trial judge determined that this made it more likely that black prospective jurors would be struck from the venire. Anderson offered no other independent evidence that the prosecutor’s decision on how to best use his peremptory challenges was based solely on race. There is also no evidence that the prosecutor attempted to completely prevent black jurors from sitting on the jury. Of the eighteen initial jurors under active consideration by the State in its first tender of a panel of twelve to the defense, thirteen members were black and five were white. That is, approximately seventy-two percent of the initial panel were black. The record also clearly shows that even after the State used all six of its peremptory challenges on black jurors, the
 
 *914
 
 final jury was still made up of seven black jurors and five white jurors.
 

 ¶ 22. We are reminded that whether an objecting party has presented a prima facie case is a determination of fact, and the trial judge is given great discretion in evaluating whether the objecting party has met this burden.
 
 Thorson v. State,
 
 721 So.2d 590, 593(¶ 4) (Miss. 1998). In this case, the trial judge was in the best position to determine such factual issues and had the unique opportunity to evaluate the selection process in its entirety due to the delayed
 
 Batson
 
 objection by Anderson. He observed the composition of the venire panel as a whole and saw the racial composition of the tendered jurors at the time of each strike. Therefore, we cannot say that the trial judge abused his discretion by not requiring the State to present race-neutral reasons for its peremptory challenges. Accordingly, we will not reverse the trial judge’s decision on this issue when the
 
 Batson
 
 objection was untimely, the nature of the case involved no race issue, and when almost three-fourths of the initial panel members were African American.
 

 III. Whether the trial court erred by admitting improper hearsay testimony.
 

 ¶ 23. “Our well-settled standard of review for the admission or suppression of evidence is abuse of discretion.”
 
 Miss. Transp. Comm’n v. McLemore,
 
 863 So.2d 31, 34(¶4) (Miss. 2003). The decision of the trial court must stand “unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.”
 
 Id.
 
 (citation omitted). Furthermore, when an error is made by the trial court regarding the admission
 
 or
 
 suppression
 
 of
 
 evidence, this Court “will not reverse ... unless the error adversely affects a substantial right of a party.”
 
 Gibson v. Wright,
 
 870 So.2d 1250, 1258(¶ 28) (Miss.Ct.App.2004).
 

 ¶24. Anderson contends that the trial court erroneously admitted hearsay testimony by Sergeant Williams. Sergeant Williams was allowed, over several objections, to testify as to what he was told by Butts, Smith, and Kinds during his investigation of the shooting. Specifically, Anderson objected to the fact that the trial court allowed Sergeant Williams to repeat that Smith and Butts both had identified Anderson as the shooter and that Kinds had stated that he saw Anderson at the scene but did not see Anderson fire any shots. Anderson argues that this allowed the State to unfairly bolster its witnesses’ testimony by denying him the opportunity to cross-examine these witnesses. The State contends that Sergeant Williams’s testimony was admissible because it was not offered to prove the truth of the matter asserted but rather to explain his course of conduct during his investigation.
 

 ¶ 25. Mississippi Rule of Evidence 801(c) states: “ ‘Hearsay’ is a statement, other than one made by the declar-ant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Our supreme court has granted an exception for certain hearsay statements made to the police during the course of their investigation, holding that such statements are permissible.
 
 Gray v. State,
 
 931 So.2d 627, 631(¶ 14) (Miss.Ct.App.2006) (citing
 
 Swindle v. State,
 
 502 So.2d 652, 658 (Miss.1987)). “It is elemental that a police officer may show that he has received a complaint, and what he did about the complaint without going into the details of it.”
 
 Swindle,
 
 502 So.2d at 658. However, where the out-of-court statement is “testimonial” in nature, the statement is generally not admissible unless the declarant is unavailable to testify in court, and the defendant has had a prior
 
 *915
 
 opportunity to cross-examine him or her.
 
 Crawford v. Washington,
 
 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
 

 ¶ 26. Anderson supports his argument of reversible error by citing
 
 Ratcliff v. State,
 
 308 So.2d 225, 227 (Miss.1975), which held that what an informant tells officers in the course of their investigation is hearsay and is inadmissible.
 
 Id.
 
 However, we find that
 
 Ratcliff
 
 does not support Anderson’s contentions. This Court has previously interpreted
 
 Ratcliff
 
 to mean that “governmental officers cannot divulge the information elicited from informants if those same informants are not available for cross-examination by the defendant, for it would violate that defendant’s right to confront his accusers.”
 
 Stubbs v. State,
 
 878 So.2d 130, 134(¶ 9) (Miss.Ct.App.2004). In this case, all three witnesses were available for cross-examination, and all were called to testify at trial. Therefore, Anderson’s right to confront Butts, Smith, and Kinds and examine the veracity of their statements was not violated.
 

 ¶ 27. Thus, we find the trial court did not err when it allowed Sergeant Williams to testify about the statements given to him by Butts, Smith, and Kinds during the course of his investigation of the shooting. These statements were not admitted for the purpose of proving the truth of the matter asserted but rather to explain the next step in Sergeant Williams’s investigation, which was to develop a photographic lineup that included Anderson’s picture. Further, even if Sergeant Williams’s recitation of the witnesses’ statements were considered to be testimonial, any error by the trial court in admitting the statements would be harmless because Anderson had the opportunity to cross-examine all three witnesses at trial. This issue is without merit.
 

 IV. Whether the trial court erred by granting two “flight” jury instructions.
 

 ¶ 28. Anderson’s last assignment of error is that there was insufficient evidence to support two separate “flight” jury instructions. Anderson argues that there was no direct evidence that he ever left Greenwood prior to being arrested. Further, Anderson argues that any evidence that he “skipped town” was based on hearsay testimony and wholly unreliable. The State contends that there was evidence to support the instruction given that Anderson was unable to explain his whereabouts for the three-and-a-half-month period that police were looking for him. The State also maintains that Anderson was unable to contradict testimony that upon his arrest, police found him hiding underneath a house.
 

 ¶ 29. In determining whether error lies in the granting of jury instructions, the instructions must be read as a whole.
 
 Johnson v. State,
 
 823 So.2d 582, 584(¶4) (Miss.Ct.App.2002). “When so read, if they fairly announce the law of the case and create no injustice, no reversible error will be found.”
 
 Id.
 

 ¶ 30. Our supreme court has consistently held that “flight is admissible as evidence of consciousness of guilt.”
 
 Fuselier v. State,
 
 702 So.2d 388, 390(¶ 4) (Miss. 1997) (citing
 
 Williams v. State,
 
 667 So.2d 15, 23 (Miss.1996)). However, a flight instruction “is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge.”
 
 Id.
 
 (quoting
 
 Reynolds v. State,
 
 658 So.2d 852, 856 (Miss.1995)). Therefore, evidence of flight is inadmissable where there is an independent reason for the flight.
 
 Id.
 
 at 390-91(¶ 7).
 

 ¶ 31. The State offered evidence tending to show that Anderson attempted to
 
 *916
 
 avoid law enforcement authorities for a three-and-a-half-month period, including the day of his arrest. Sergeant Williams testified that following the shooting, the police were unable to determine Anderson’s whereabouts even though they checked his residence, as well as neighborhoods and other locations where he was known to be seen. Sergeant Williams also testified that he received a confidential-informant tip that Anderson had “skipped town” and gone to Tennessee. Sergeant MeCaskill testified that it was not until three months later that he received another informant tip that Anderson was back in Greenwood and living in a house at “Broad and Avenue K.” Further, when police attempted to arrest Anderson, they found him hiding underneath the house.
 

 1132. Anderson relies on
 
 Pannell v. State,
 
 455 So.2d 785 (Miss.1984) in which our supreme court held that a flight instruction was not permissible where, as in this case, law enforcement testified they searched unsuccessfully for the defendant. The court held that this testimony was not proof of flight and did not negate the uncontradicted testimony of Pannell that he went home after the alleged shooting.
 
 Id.
 
 at 788-89. Specifically, Pannell testified that after the shooting he went to a sister’s home where he had been staying, phoned the sheriffs office to report the incident, tried unsuccessfully to contact his attorney, and on the following day, turned himself in.
 
 Id.
 
 at 788. The court determined that because Pannell’s testimony was uncontradicted, his flight was fully explained, and no flight instruction was warranted.
 
 Id.
 

 ¶33. The facts of this case are distinguishable from those in
 
 Pannell
 
 as Anderson’s flight was never fully explained. First, the record reveals that there was contradicted testimony as to Anderson’s whereabouts following the shooting. Specifically, both Sergeant Williams and Sergeant MeCaskill testified that they received two separate informant tips that Anderson had fled the state and resurfaced three-and-a-half months later. This evidence is strengthened by the fact that the police were unable to find Anderson after searching many of the places that he was known to visit. Second, Anderson has failed to provide an independent explanation for why he was hiding under his house on the day of his arrest. Anderson attempts to argue on appeal that he was hiding because he feared he was being “set up.” However, there is .nothing in the record to support this argument. The only reason that Anderson gave at trial for hiding under the house was that he was a convicted felon and afraid of going back to jail.
 

 ¶ 34. Therefore, we find that there was probative value in considering flight under these circumstances, and the trial court did not err by granting the flight jury instructions. This issue is without merit.
 

 CONCLUSION
 

 ¶ 35. For the foregoing reasons, we affirm Anderson’s convictions and sentences.
 

 ¶ 36. THE JUDGMENT OF THE LE-FLORE COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, AGGRAVATED ASSAULT, AND SENTENCE AS A HABITUAL OFFENDER OF TWENTY YEARS, COUNT II, AGGRAVATED ASSAULT, AND SENTENCE AS A HABITUAL OFFENDER OF TWENTY YEARS, AND COUNT III, POSSESSION OF A FIREARM BY A CONVICTED FELON, AND SENTENCE OF THREE YEARS, WITH ALL SENTENCES TO RUN CONCURRENTLY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT ELIGIBILITY FOR PROBATION OR PAROLE,
 
 *917
 
 IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LE-FLORE COUNTY.
 

 LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ROBERTS AND CARLTON, JJ., CONCUR.
 

 KING, C.J., CONCURS IN THE RESULT ONLY.
 

 IRVING, J., CONCURS IN PART AND IN THE RESULT.