# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-KA-01809-SCT

*CHARLES ERVIN a/k/a CHARLES D. ERVIN a/k/a*
*MICHAEL ERVIN a/k/a CHARLES DARNELL*
*ERVIN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/09/2011 |
| TRIAL JUDGE: | HON. JEFF WEILL, SR. |
| TRIAL COURT ATTORNEYS: | LESLIE R. BROWN |
| | SHANNON COGHLAN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JUSTIN TAYLOR COOK |
| | GEORGE T. HOLMES |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| | JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 04/24/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KING, JUSTICE, FOR THE COURT:**

¶1.    A jury convicted Charles Ervin ("Charles"), a convicted felon, of armed robbery and

felon in possession of a handgun following the armed robbery of the Healthy Body Store.

Police were able to identify Charles as a suspect after his brother, also a convicted felon,

pointed the police in Charles's direction. At trial, the trial court gave a flight instruction over the objection of the defendant. The jury found Charles guilty, and the trial court sentenced him and included a gun enhancement in the sentencing. This appeal followed. Because the trial court improperly limited the defense's cross-examination of a key State witness, this Court reverses Charles's convictions and remands the case to the trial court for a new trial.

**FACTS**

¶2.     On September 2, 2010, the Healthy Body Store on the corner of Northside Drive and Livingston Road was robbed at gunpoint. The store manager, Martha Duffy, was the only person working at the store at the time. A man walked past the store, then walked back to the store and entered it. He asked for a product, then walked up and down the store aisles. He then made his way back up to the front of the store, pointed a gun at Duffy, and demanded money. After she gave him money, he made a few more demands, ordered Duffy under the desk, and departed. As soon as he left the store, Duffy called 911. She described the robber as wearing black shorts, a black shirt, and a baseball cap, and described the gun as a dark-colored handgun. The police arrived quickly and canvassed the area.

¶3.     Canvassing the area led the police to a house on Brinkley Drive, close to the store, where they spoke with Linda Stapleton. Stapleton told police that a man fitting the description of the robber had come to the door and asked for "Gary" and that she informed the man that "Gary" was not there. The conversation with Stapleton led police to a house on Douglas Avenue, also close by.[1]

---

[1]Officer Mitchell, who spoke with Stapleton, testified that Stapleton told him that the man who came to her door was "Ray Ray," and that she gave Officer Mitchell the address

¶4.     At the house on Douglas Avenue, police encountered Michael Ervin ("Michael"), also known as Ray Ray. When police arrived at his house, Michael was wearing black shorts and was putting on a red shirt. Michael was not sweating, nor was he out of breath. He informed the police that he had been at home all day. He also informed them that his brother Charles had been at the house on Douglas Avenue approximately thirty minutes prior to the officers' arrival.[2] The police eventually took Michael to the police station for further investigation.[3] During the police interview of Michael at the police station, he allegedly stated that Charles also goes by the name Ray Ray.[4] He also repeated that he had seen Charles at the Douglas Avenue house approximately thirty minutes prior to the arrival of the police.

¶5.     Martha Duffy was also taken to the police station immediately after the robbery. While there, Duffy picked Charles's photograph out of a photo lineup. After she picked Charles's photograph out of the lineup, the police placed Michael in a room with secured mirror glass, and asked Duffy if Michael was the man who robbed her. She indicated that Michael was not the man who robbed her. On September 24, 2010, more than three weeks

---

at which Ray Ray lived on Douglas Avenue. Former Detective Stevenson likewise testified that Stapleton informed him that Ray Ray came to her door. "Ray Ray" is an alias of Michael Ervin, the defendant's brother. However, when Linda Stapleton testified, she testified that Charles Ervin, Ray Ray's brother, was the man who knocked on her door, and that she was sure it was not Ray Ray, or Michael Ervin, because she had been in a romantic relationship with Michael approximately twenty years prior.

[2]Michael apparently lived at the Douglas Avenue house with his father. Charles lived in an apartment with his girlfriend and their daughter.

[3]The police also performed a consent search of the house on Douglas Avenue and recovered two revolvers.

[4]At trial, Michael testified that one of Charles's nicknames was "Little Ray Ray."

3

after the robbery occurred, federal marshals arrived at Charles's apartment and arrested him. When they arrived, Charles went into the attic, from which there was no exit. The record contains no evidence that Charles knew of the charges for which he was being arrested. On September 26, 2010, Charles allegedly went to the hospital while in custody, where he allegedly escaped from the security guard assigned to guard him.

## PROCEDURAL HISTORY

¶6.     On February 2, 2011, the State indicted Charles for armed robbery, including that he used or displayed a firearm during the commission of the armed robbery, and for being a felon in possession of a firearm. Trial was set for summer of 2011. On June 3, 2011, the State obtained a second indictment against Charles, this one for escape, based on his alleged September 26, 2010, escape from custody at a hospital. Then, on July 27, 2011, the State obtained a third indictment against Charles for the same circumstances. This indictment was a three-count indictment and included the armed-robbery charge, the felon-in-possession-of-a-firearm charge, and the escape charge. The three-count indictment was assigned to a different judge than were the first two indictments. The State then elected to pursue the armed-robbery and felon-in-possession charges under the original indictment, instead of the three-count indictment.

¶7.     Among the State's witnesses at trial was Richard Stevenson, the former detective who had interviewed Michael at the police station. The defendant attempted to cross-examine Stevenson on the personal information that Michael had given him, based on an NCIC[5]

_____

[5]"NCIC" stands for the Federal Bureau of Investigation's National Crime Information Center, a computerized index of criminal history information.

4

printout and a witness location form filled out by Stevenson. Specifically, the defendant was attempting to show that Michael had used multiple different social security numbers and birthdates, including Charles's. The theory of the defense was essentially that Michael committed the robbery and then attempted to pin it on Charles. Through Stevenson, the witness location form, and the "all over the map" NCIC report that Stevenson received on Michael, the defendant wanted to show that Michael was "known to give false information. He's used his alias three different times" and that "the accuracy of this detective's investigation is an issue." The State objected to this line of questioning, and the court sustained the objections, stating that it did not see the relevance of the line of questioning. At one of the two bench conferences on the issue, the following occurred:

> Q: What – what do you show for Michael Ervin's date of birth?
> BY MS. COGHLAN: Again, Your Honor, same – same objection.
> BY MS. BROWN: I think – I think when you see – when I ask the next question, you'll understand.
> BY THE COURT: Well, before we get there, I'll have to sustain that. Michael Ervin is not on trial and I just – I don't see it's relevant.
> BY MS. BROWN: Judge, the accuracy of this detective's investigation is an issue.
> BY THE COURT: Y'all approach.
> (BENCH CONFERENCE AS FOLLOWS:)
> BY MS. BROWN: He has supplied two different birthdays and two different social security numbers in forms that he completed for witness location folders on Michael Ervin.
> BY MR. KESLER: Your Honor, that's – (inaudible)
> BY MS. BROWN: Okay.
> BY THE COURT: All right. So you're withdrawing the question?
> BY MS. BROWN: No. I'm accepting the Court's rulings.
> BY THE COURT: All right. I'll sustain it.

¶8. At trial, the State sought to introduce evidence of Charles's alleged September 26, 2010, escape from a hospital while in custody, as evidence of a guilty conscience. The State

5

attempted to introduce such evidence through the testimony of Wade Pickens, the security officer from whose custody Charles allegedly escaped. The defendant vociferously objected to this testimony on several grounds, the testimony was proffered, and the court overruled the defendant's objection. Among the many reasons for the objection given were that the State elected not to proceed with the escape charge in the current trial and was surprising the defendant with the introduction of evidence of escape in the trial for armed robbery and felon in possession of a firearm, with defense counsel stating "But in this circumstance, they elected not to proceed with the escape. *I feel like I'm being sandbagged.* I feel like this information is being put before the jury solely to prejudice the jury." (Emphasis added.) However, Wade Pickens then testified that the prisoner whom he was assigned to guard that day was not in the courtroom, thus failing to identify Charles. Accordingly, no evidence of Charles's alleged September 26, 2010, escape from custody was presented at trial.

¶9.    Melissa "Minnie" Sulton, Charles's girlfriend, testified for the defense, giving an alibi for Charles. On cross-examination, the State elicited testimony from Sulton that Charles went to the attic when the marshals came to arrest him. Sulton testified that she had no knowledge of what the charges were against Charles at that time. There was no testimony that Charles knew of the charges against him at that time.

¶10.    Both sides rested, and then presented jury instructions. The State presented S-6, which was a flight instruction.[6] The defendant objected based on the fact that the flight

---

[6]The flight instruction stated that:

"Flight" is a circumstance from which guilty knowledge and fear may be inferred. If you believe from the evidence in this case beyond a reasonable doubt that the defendant, CHARLES ERVIN, did flee or go into hiding, such

6

witness (from the September 26 flight) had failed to identify the defendant. The State countered that Sulton gave evidence of Charles hiding in the attic on September 24, and the court decided to give the instruction.

¶11. On August 10, 2011, the jury found Charles guilty of armed robbery and being a felon in possession of a firearm. The court sentenced Charles to twenty-five years for the armed robbery, with ten years for the gun enhancement, to run consecutively, and then to ten years for the felon-in-possession-of-a-firearm charge, to run concurrently with the other sentence. Charles filed a motion for judgment notwithstanding the verdict (JNOV), or in the alternative, for a new trial, which the trial court denied. This appealed followed.

¶12. On appeal, Charles argues that: 1) the trial court erred in granting the flight instruction; 2) the sentences for both the gun enhancement and the felon-in-possession charge violate double jeopardy; 3) the trial court erred by preventing Charles from cross-examining Stevenson, thus depriving him of presenting his theory of defense; and 4) this Court should abolish the use of flight instructions in Mississippi. We find the issue of whether the trial court erred by limiting cross-examination dispositive.

## ANALYSIS

***Whether the trial court erred by limiting the defense's cross-examination of Stevenson, thus harming the theory of the defense***.

---

flight or hiding is to be considered in connection with all other evidence in this case. You will determine from all facts whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things and give it such weight as you think it is entitled to in determining the guilt or innocence of the defendant.

7

¶13. Limitations placed on cross-examination are reviewed using an abuse-of-discretion standard. *Jefferson v. State*, 818 So. 2d 1099, 1109 (Miss. 2002).

¶14. During cross-examination of former-Detective Stevenson, the trial court refused to allow the defense to use an NCIC report and a witness location form to examine Stevenson about the fact that Michael had given Stevenson various social security numbers and birthdays for himself, some of which belonged to Charles, not Michael. The defense attempted to attack the credibility of Stevenson's investigation, in that he did not further investigate Michael when he knew Michael gave false aliases.

¶15. The State first argues that this issue is procedurally barred, because it was waived, as the State claims that "defense counsel stated that she accepted the Court's rulings, and she did not preserve an objection to the ruling." This argument is without merit. Defense counsel attempted several times to question Stevenson on this issue. The State objected each time. After much argument, the Court sustained the first round of the State's objections to the defense's questions. After much argument during the second round of objections, the trial court asked defense counsel if she withdrew the question. She stated "*No.* I'm accepting the Court's rulings." (Emphasis added.) This indicates that she was simply done arguing, and she affirmatively stated that she was not withdrawing her questions. The trial court clearly understood this to be her meaning, as the court responded "All right. I'll sustain it." ("It" being the State's objection to the defense's line of questioning). The trial court would have no reason to sustain the State's objection if defense counsel had withdrawn the question. Charles in no way waived this issue; it appears that defense counsel simply understood that the Court did not accept her arguments and thus indicated she would stop

debating the issue.

¶16.    The State then argues that this issue is without merit because the NCIC report was not admissible and because the exclusion did not prejudice Charles because he aptly presented his theory of defense.  It also argues that "the witness had already testified that he had no record or recollection that Michael Ervin had used Charles Ervin's identity and social security number on two occasions."[7]

¶17.    Mississippi Rule of Evidence 612 allows a witness to use documents to refresh his memory while testifying.  Miss. R. Evid. 612.  A document used to refresh a witness's recollection need not be admissible under the Mississippi Rules of Evidence.  *Hunt v. State*, 687 So. 2d 1154, 1162 (Miss. 1996).  "The only requirement is that the witness have no present memory of the event."  *Id.*  When defense counsel asked Stevenson "Do you have a recollection of that?"[8] he responded "No."  Thus, the State's argument that the defense could not use these documents to refresh Stevenson's memory on cross-examination because they were not admissible is without merit.

¶18.    The trial court sustained the State's objections to this line of questioning because it determined it was irrelevant.  Relevant means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable

---

[7]Stevenson did testify that he could not remember Michael using Charles's information.  His lack of recollection is precisely why the defense attempted to use the NCIC report and the witness location form, so that his recollection could be refreshed. The defense stated: "If I gave you some documents, could you refer to them and refresh your recollection?"

[8]"That" refers to the defense's prior question: "It's a fact that as you were going through this investigation you determined at some point that Michael Ervin had used Charles Ervin's identity and social security number on at least two occasions, isn't it?"

9

or less probable than it would be without the evidence." Miss. R. Evid. 401. Charles's theory of the defense was that Michael committed the burglary and then pinned it on Charles. Michael's use of Charles's identity when dealing with police is relevant to that issue.

¶19.     However, this Court "will not reverse the trial court's evidentiary ruling unless the error adversely affects a substantial right of a party." *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010). Charles's theory of the case was that his brother committed the armed robbery and then pointed police to Charles. The State argued that Charles aptly presented his theory of the defense because he questioned witnesses about the fact that "Ray Ray" was identified as the robber, and Michael was "Ray Ray." Such questioning is not the same as evidence that Michael gave police Charles's social security number and birthday as his own. Such evidence could have affected the jury's understanding about Michael lying to the police and pointing the police to Charles. *See id.* Charles was precluded from putting on such evidence, and evidence that Ray Ray was identified is not of the same vein. "The exclusion of the evidence prevented [Charles] from fully presenting his theory of the case to the jury and thus adversely affected his right to a fair trial." *Id.* We therefore reverse Charles's convictions on this basis.[9]

---

[9]Because we reverse Charles's convictions, we need not determine whether the gun enhancement to the armed-robbery charge combined with the felon-in-possession-of-a-firearm conviction violates double jeopardy. However, we note that sentencing enhancements do not typically implicate double jeopardy. *See, e.g., Witte v. United States*, 515 U.S. 389, 115 S. Ct. 2199, 132 L. Ed. 2d 351 (1995) (considering behavior surrounding the circumstances of a crime to enhance the sentence for that crime does not constitute "punishment" for double jeopardy purposes); *Mayers v. State*, 42 So. 3d 33 (Miss. Ct. App. 2010).

¶20.   We need not decide the issue of whether the flight instruction was error;[10] however, because the issue may arise on remand, we note the questionable wisdom of granting it. "[T]he use of the flight instruction in this state can be described in one word – 'dangerous.'" *Randolph v. State*, 852 So. 2d 547, 567 (Miss. 2002) (Carlson, J., specially concurring, joined by Smith, P.J., Waller, and Cobb, JJ.).   "[A] trial court, by giving a flight instruction, simply puts itself in a position of possibly placing a reversible error in an otherwise clean record.  If a trial court persists in giving a flight instruction, . . . it [should] do so with great caution." *Id.*  "[W]ith the prosecutors having been duly warned on multiple occasions about the danger of submitting flight instructions, there can be no legitimate hue and cry from the State in the future if this Court . . . reverses a criminal conviction based on the trial court's improper grant of a flight instruction, which had been improvidently submitted by the prosecutor." *States v. State*, 88 So. 3d 749, 759 (Miss. 2012) (Carlson, P.J., Specially Concurring).

¶21.   This Court has adopted a two-pronged test to determine whether a flight instruction is appropriately given to a jury. *States*, 88 So. 3d at 758.  First, "[o]nly unexplained flight merits a flight instruction." *Id.*  Second, "flight instructions are to be given *only* in cases where that circumstance has *considerable* probative value." *Id.* (emphasis added).

¶22.   In this case, the "hiding" at the time of arrest occurred more than *three weeks* after the

---

[10]The separate opinion suggests that we find the flight instruction improper or in error in this case.  We make no such explicit finding.  Rather, we merely point the trial court to our recent caselaw regarding the limited circumstances under which a flight instructions should be given, so that it may consider such when deciding to grant a flight instruction, should the issue arise on remand.

11

armed robbery; no evidence exists that Charles knew for what charges law enforcement officers came to arrest him; and Charles "fled" to or "hid" in his own attic, which had no exit, for a few moments while his girlfriend informed law-enforcement officials of his whereabouts.[11]

¶23. We question whether evidence of flight in this case, where the defendant hid in his own attic (with no exit) from law-enforcement agents during an arrest for a crime that occurred three weeks prior, while the "escapee" had no knowledge of the crime for which he was being arrested, is remotely probative of guilt, much less *considerably* probative of guilt. Courts should examine the facts of each specific case when considering a flight instruction; however, the longer the time period between the crime and the flight, the more arduously a court should scrutinize its probative value. *See United States v. Myers*, 550 F.2d 1036, 1051 (5th Cir. 1977) ("The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense.").

## CONCLUSION

¶24. The improper limitation on cross-examination adversely affected Charles's right to a fair trial and warrants reversal. Thus, this Court reverses Charles's convictions and sentence and remands the case to the trial court for a new trial consistent with this opinion.

---

[11]Defining "flight" often presents a conundrum. *See Pannell v. State*, 455 So. 2d 785, 790 (Miss. 1984) (Robertson, J., specially concurring) (there exist many "problems with flight evidence and instructions, not the least of which is the practical question 'what is flight?'"); *Randolph v. State*, 852 So. 2d 547, 567 (Miss. 2002) (Carlson, J., specially concurring) ("The term 'unexplained flight' is somewhat nebulous, anyway[.]").

¶25.    **REVERSED AND REMANDED.**

**WALLER, C.J., DICKERSON, P.J., LAMAR, KITCHENS AND CHANDLER, JJ., CONCUR. RANDOLPH, P.J., AND COLEMAN, J., CONCUR IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. PIERCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J.**

**PIERCE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶26.    I agree with the majority that the limitation on cross-examination denied Charles Ervin a fair trial and warrants reversal. Respectfully, however, I find no problem that a flight instruction was granted in this case. Therefore, I concur in part and dissent in part.

¶27.    Mississippi has long recognized that "an accused's flight, escape from custody, resistence to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus guilt itself." *McClendon v. State*, 387 So. 2d 112, 115 (Miss. 1980). As noted by the majority, in deciding whether to grant a flight instruction, the trial court must take into account two considerations: (1) only unexplained flight merits a flight instruction, and (2) flight instructions are to be given only in cases where that circumstance has considerable probative value. The two-pronged test must also be met in order to introduce flight evidence. *Austin v. State*, 784 So. 2d 186, 194 (Miss. 2001) (citing *Fuselier v. State*, 702 So. 2d 388, 390 (Miss. 1997)). This means that Mississippi, unlike some jurisdictions, does not distinguish between the admissibility of flight evidence and the propriety of instructing the jury on the law of flight. *Cf. U.S. v. Martinez*, 681 F.2d 1248, 1257 (10th Cir. 1982) ("Trial courts usually focus not upon the admissibility of flight evidence but upon the propriety of including a jury instruction highlighting already admitted flight evidence."); *but see United States v. Register*, 496 F.2d

13

1072, 1077 (5th Cir. 1974), *cert. denied sub nom.* **Cochran v. U. S**., 419 U.S. 1120, 95 S.Ct. 802, 42 L. Ed. 2d 819 (1975) (holding that, because the jury was given a proper flight instruction, the federal district court did not err in allowing testimony from a teenage girl babysitting defendant's child in defendant's apartment, in which the girl told the jury that, after defendant was informed of drug raid, defendant failed to return to his apartment; the Court of Appeals found the flight evidence was admissible even though the drug raid was conducted by state officials on a different charge).

¶28. Here, both prongs were met.

¶29. The fact that Charles "ran up" to the attic when federal marshals arrived at the apartment where Charles was staying to arrest him, entered Charles's armed-robbery trial during the State's cross-examination of his alibi witness, Melissa Sulton, Charles's girlfriend at the time. Sulton maintained throughout cross-examination that she did not know why the marshals were looking for Charles. Sulton also admitted that she knew authorities were looking for Charles prior to the marshals' arrival because she had received a phone call from the mother of one of Charles's other children that "the feds" were looking for Charles.

¶30. That no direct evidence was presented showing that Charles had any knowledge of the crime for which he was arrested, is of no matter. *See, e.g.*, **United States v. Hernandez-Miranda**, 601 F.2d 1104, 1106 (9th Cir. 1979) (holding that, while "other reasons *might* support [defendant's] decision to take flight, . . . this in itself does not make a flight instruction improper) (emphasis added). What Mississippi law requires is that there be no showing of a reasonable explanation otherwise. As we related in **Austin**, the common factor in cases where "'explanations' were [found] substantial enough so that a flight

14

instruction was not proper[,] . . . is that, in those circumstances, it would have been illogical for a defendant not to have run." *See Austin*, 784 So. 2d at 195 (noting, for example, circumstances where defendant was an escapee, or driving a stolen car, or leaving the scene of the alleged crime based on threats from another person or from potential danger from the victim). That conclusion cannot be reached here except by conjecture. Thus, the first prong was conclusively established.

¶31. The flight evidence also was considerably probative under the circumstances of this case. First, Charles's alibi defense, which laid the foundation of the flight evidence, enhanced the probative value of the evidence. Sulton testified that Charles was with her the day of the alleged robbery because he had picked her up from work early that afternoon. The two were together the rest of the day, according to Sulton. Approximately three weeks later, when Sulton received a phone call from the individual mentioned above informing her that authorities were looking for Charles, Sulton did not inquire why because–reflecting back–she knew Charles was incapable of committing armed robbery. From Sulton's testimony relating Charles's actions prior to his arrest, coupled with the rest of her testimony, the jury reasonably could infer that Sulton was not credible and knew Charles was a suspect in the crime in question, and that Charles was not with Sulton when the robbery occurred.

¶32. Second, the most probative circumstance is that regarding Charles's brother, Michael, who, according to the defense's theory of the case, was the one who committed the robbery. On the day of the alleged robbery, Michael was taken in for questioning by Officer Adelbert Moore, the responding officer to the Healthy Body Store. Moore testified that Michael was never a suspect in the alleged robbery because Michael did not fit the description given by

15

the victim, Martha Duffy. Again, Duffy identified Charles form a photo lineup as the person who had robbed her. And after she observed Michael sitting in the interview room through a two-way mirror, Duffy expressly excluded Michael as the suspect. During questioning, and later, at trial, Michael said Charles had stopped by Michael's residence about thirty minutes before the police had arrived at the house. The house is located near the Healthy Body Store. Michael described the clothes Charles was wearing, which matched the descriptions given by both Duffy and Linda Stapleton. Again, Stapleton, who also lived near the Healthy Body Store, and who knows both Michael and Charles, said Charles was the person who knocked on her door, looking for "Gary."

¶33.    Based on this testimony, any time-lapse concern with the three-week period between the alleged robbery and Charles's apprehension is quashed. One can infer reasonably from the circumstances surrounding Michael's cooperation with authorities juxtaposed with Charles's response, that Charles knew that authorities were looking for him in connection with the alleged robbery and fled and hid due to consciousness of guilt for the crime.

¶34.    The flight instruction given by the trial court in this case stated:

> "Flight" is a circumstance from which guilty knowledge and fear may be inferred. If you believe from the evidence in this case beyond a reasonable doubt that the defendant, Charles Ervin, did flee or go into hiding, such flight or hiding is to be considered in connection with all other evidence in this case. You will determine from all facts whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things and give it such weight as you think it is entitled to in determining the guilt or innocence of the defendant.

¶35.    This is a proper instruction, as approved by this Court in **Ransom v. State**, 149 Miss. 262, 115 So. 208, 210 (1928) (overruled on other grounds). And I find no error with the trial

court's decision to grant it in this instance.

**RANDOLPH, P.J., JOINS THIS OPINION.**