## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 2015-KA-00691-SCT

*DANER FORD a/k/a DANNER FORD a/k/a DANA FORD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/19/2010 |
| TRIAL JUDGE: | HON. BETTY W. SANDERS |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MERRIDA COXWELL |
| | CHARLES RICHARD MULLINS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/22/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., COLEMAN AND MAXWELL, JJ.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     A jury found Daner Ford guilty of acting in concert to bring about the death of Marvin

Stuckett, for a firearm enhancement, and for being a convicted felon in possession of a

firearm.  The trial court sentenced him as a habitual offender to a term of life imprisonment

in the custody of the Mississippi Department of Corrections.  Aggrieved, Ford appeals.

Discerning no error, we affirm.

**FACTS**

¶2. At approximately 3:00 a.m. on September 7, 2008, Marvin Stuckett was fatally shot outside his home on Stockton Drive, in Greenville, Mississippi. Witnesses testified that the sounds of the gunshots indicated two weapons: a semi-automatic rifle and a large-caliber pistol. One witness saw what looked like a white Chevy Caprice driving outside, but witnesses otherwise could not identify the shooters. Stuckett was found lying in his neighbor's carport. First responders transferred him to the hospital, where he succumbed to his injuries.

¶3. Officer Terence Wigfall and Sergeant Elton Foster of the Greenville Police Department arrived first on the scene. They interviewed witnesses, observed the scene, and began to collect evidence. In particular, Foster collected from the ground three shells of the type fired from semi-automatic assault rifles and one round of the type fired from pistols. An assault rifle and rifle magazine were found inside a nearby vehicle and taken into evidence. At trial, witness testimony and ballistics established that the rifle and magazine had not been used in the shooting.

¶4. Interviews subsequent to Stuckett's murder revealed that the shooting had been the culmination of longstanding tension between two groups of men that had come to a head earlier that evening at a nightclub in town named Southern Whispers, where an acquaintance of all the parties was having a birthday party. Daner Ford and Carlos Smith had years of friction between them and the two men had a terse verbal exchange at the club. Stuckett was a friend of Smith's and was at the nightclub that evening, along with their other friends Nick Harmon and David Shanklin. Daner Ford was accompanied at the club by his cousins

2

Stevenson Ford and Jessie Lee and his other friends Jonathan Robinson and Freddie Harris. Smith testified at Daner Ford's trial that before Daner Ford left Smith and Smith's friends, Daner Ford said that he was "going to kill one of you."

¶5.     Later in the evening, Daner Ford and Carlos Smith "got to tussling," resulting in club security breaking the fight up and separating the two men. Stevenson Ford also engaged in a physical altercation with Smith and Harmon. Harmon testified that when security kicked out of the club Stuckett, Stevenson Ford, Robinson, and himself, Daner Ford was still outside, shirt off, shouting threats about "killing one of them "n-----s" before running off into the night. Stuckett was outside when the threats were shouted.

¶6.     Stuckett remained in Harmon's company for a while before parting ways with him and heading toward his house on Stockton Drive in his vehicle. He was shot to death soon after. Witness statements and tips called in to police led the investigators to locate and arrest Jessie Lee at a gas station in the early morning hours of September 7, 2008. Lee confessed his role in the shooting on Stockton Drive and named several others involved: Daner Ford and Stevenson Ford, Harris, Robinson, and Kendrick Johnson. According to Lee, he was driving his blue Chevy with Stevenson Ford, Robinson, and Johnson as his passengers. He was following Harris, who had Daner Ford as his passenger in his green Chevy. The two cars of men allegedly were on their way to another club when a third car ran a red light. Harris made a U-turn through a nearby gas station to follow it. Stevenson Ford told Lee to follow Harris, so Lee made a similar U-turn and followed. Lee thought that the men were now headed toward Harris's mother's house, but they ended up on Stockton Drive, where Stevenson Ford

3

told Lee to pull over and stop, despite Harris's vehicle being somewhere else up the road and out of sight.

¶7. Lee testified that Daner Ford approached his car from the front, and that Daner Ford was carrying a rifle. Daner Ford crossed in front of the car, went into a nearby yard, and then Lee heard gunshots from behind him. Lee ducked his head, as he thought the shots were "right behind [his] head." When he raised his head again, he saw that Stevenson Ford had exited the car and was shooting "back towards the way we just came in." Lee heard somebody shout, "Don't do it, OJ,"[1] but didn't recognize the voice. Lee testified that he heard five to ten gunshots, and then Stevenson Ford and Daner Ford climbed into Lee's car. Daner Ford brought the rifle with him into the back seat, joking that Stevenson Ford nearly had shot him in the head, and telling the other passengers to forget that they had seen him.

¶8. After dropping his passengers at Stevenson Ford's house, Jessie Lee parked at his grandmother's house for about half an hour and then went to a Double Quick to get gas. By this time, Stuckett had been transported to the hospital, and Officer Tisaby had been alerted that a vehicle associated with the shooting was parked at the Double Quick. Soon after his arrest at the Double Quick, Lee gave a statement to the police and ultimately pleaded guilty to being an accessory after the fact.

¶9. Daner Ford gave a recorded statement to the police during the daytime hours of September 7, 2008. Detective Erica Brown conducted the interview and testified that she noticed an abrasion on Ford's nose, which Daner Ford told her was from the fight with Smith

---

[1]"OJ" is Stevenson Ford's nickname.

4

at Southern Whispers. In the recorded interview, Daner Ford recounted the altercation with Smith and stated that, after leaving Southern Whispers, Daner Ford went to Stevenson Ford's house and "laid out." He walked to his own home around 4:00 or 4:30 a.m. Daner Ford stated that he did not have a problem with Stuckett; that his problem was with Smith. The police then allowed Daner Ford to leave the station.

¶10. On Monday, September 8, 2008, the police department issued warrants for Daner Ford, Stevenson Ford, Harris, and Robinson. Stevenson Ford, Harris, and Robinson were arrested at Stevenson Ford's residence. Investigator Delano Wilson contacted T. George Kelly, Ford's attorney, and Kelly said that he would try to get Daner Ford to turn himself in. Kelly never made contact with Daner Ford. The police used a trap and trace and, on September 15, 2008, received a signal from Daner Ford's cell phone near his mother's house. Daner Ford's brother consented to a search of the house. The police discovered Daner Ford in the attic, where he was taken into custody.

¶11. On March 2, 2009, a grand jury indicted Ford on two counts within a three-count indictment. Count I alleged that Stevenson Ford, Daner Ford, Jonathan Robinson, Freddie Harris, and Jessie Lee, "each acting in concert with the other, . . . did unlawfully, willfully, feloniously, and of their malice aforethought, then there kill and murder" Marvin Stuckett. Count I further alleged that Daner Ford had displayed a firearm during Stuckett's murder, in violation of Section 97-37-37 of the Mississippi Code. Count II alleged that Ford, a previously convicted felon, was in possession of an assault rifle. Count III concerned only Robinson. On August 7, 2009, the Circuit Court of Washington County severed the trials of

the co-defendants. On November 16, 2010, the trial judge entered an order amending Daner Ford's indictment to charge him as a habitual offender.

¶12. At trial, the State presented as witnesses Jessie Coats, Tyrone Smith, Sergeant Foster, Officer Wigfall, Carlos Smith, Nick Harmon, Christopher York, Officer Tisaby, Detective Brown, Dr. Thomas Deering, Starks Hathcock, Jessie Lee, and Delando Wilson. After the State rested, Daner Ford moved for a directed verdict, which the court denied. The defense rested without presenting any witnesses. The jury found Daner Ford guilty as charged. On Daner Ford's request, the trial court polled the jury.

¶13. On November 29, 2010, Daner Ford moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court denied the motion with a written opinion. On April 20, 2015, the circuit court granted Ford's motion to re-open the appeal deadline. Ford thereafter timely filed his notice of appeal.

## ANALYSIS

I. **The trial court did not err when it denied Daner Ford's motion for a mistrial and instead instructed the jury to disregard improper witness testimony.**

¶14. Daner Ford's first assignment of error is that the State purposefully elicited prejudicial testimony from Smith and that the trial court erred when it denied his motion for a mistrial and instead instructed the jury to ignore Smith's statement. The Court reviews the denial of a motion for a mistrial for abuse of discretion. *Flora v. State*, 925 So. 2d 797, 804 (¶ 5) (Miss. 2006) (citing *Spann v. State*, 771 So. 2d 883, 889 (Miss. 2000)).

> This Court has held that a trial judge is best suited to determine the prejudicial effect of an objectionable remark and is given considerable discretion in

6

deciding whether the remark is so prejudicial as to merit a mistrial. ***Roundtree v. State***, 568 So. 2d 1173, 1177 (Miss. 1990). Unless "serious and irreparable damage" results from an improper comment, the judge should "admonish the jury then and there to disregard the improper comment." ***Johnson v. State***, 477 So. 2d 196, 210 (Miss. 1985). While deference is given to decisions of trial judges, each case must stand on its own facts in order to determine whether a particular decision constitutes reversible error. ***Henderson v. State***, 403 So. 2d 139, 140 (Miss. 1981).

***Flora***, 925 So. 2d at 804 (¶ 5).

¶15.    The statement in dispute occurs at the beginning of Smith's testimony, while the

prosecutor was establishing for the jury the acquaintance between Smith and Ford:

> Q: Did you know Daner Ford before that night?
> A: Yes, sir.
> Q: Did how long had you known him?
> A: Since junior high.
> Q: And did you all go to school together or around the same age?
> A: Well, you know, I went to school, you know what I'm saying.
> Q: Okay, but you all were around the same age?
> A: Yes, sir.
> Q: Now, prior to that night, had you and Daner Ford ever had bad blood?
> A: No, sir.
> Q: Had there ever been any problem between the two of you?
> A: *Back in like '94 he had shot me.*
> Q: Now–
> Mr. Kelly: Your Honor, objection.

(Emphasis added.) The attorneys approached the bench, where the trial court heard argument

on the objection. Daner Ford's attorney first argued that the 1994 shooting had not been

revealed to the defense, and when the State rebutted that argument, the defense argued that

the statement was improper character evidence in violation of Mississippi Rule of Evidence

404(b). The State replied that it had intended only to show the jury that Smith and Daner

Ford were not friends and had a history of not being friends, but that the State had not sought

to elicit the particular statement about the prior shooting. The defense responded that the "bad blood" between Smith and Daner Ford was irrelevant to Stuckett's murder, but the trial court replied the poor relationship did seem relevant, as "the confusion arose at Southern Whispers, and they already had bad blood, and that is what got everybody riled up."

¶16. The trial court denied the motion for a mistrial and then turned to the jury, stating: "The Court is going to instruct you to disregard the question and the answer as it relates to the bad blood between these two gentlemen culminating in an act in 1994. Disregard that, no consideration of it during deliberations." The State then proceeded with questioning about the activity at Southern Whispers the night of Stuckett's murder, and the 1994 shooting was not mentioned by either party again.

¶17. Now on appeal, Daner Ford argues that the denial of a mistrial was an abuse of discretion, as Smith's statement inflamed and prejudiced the jury. We disagree. The trial court properly followed our guidance in *Flora*, 925 So. 2d at 804 (¶ 5). The trial court heard significant bench argument from both the State and Daner Ford's trial counsel before denying the motion for a mistrial. The court then instructed the jury to disregard Smith's statement, and no further mention was made of the 1994 shooting. Even if Smith's statement from the witness stand indeed were inadmissible and irrelevant, that error would not be so "serious and irreparable" that it would warrant a mistrial. *Id.*

¶18. Daner Ford contends that the jury could not have ignored Smith's statement, even when instructed to do so by the trial court. Daner Ford argues that the trial court's admonishment served only to highlight the inadmissible statement. We disagree. First,

8

Daner Ford's trial counsel failed to object contemporaneously to the trial court's admonition, waiving the assignment of error. *See Watts v. State*, 733 So. 2d 214, 232-33 (¶ 53) (Miss. 1999) (holding that a failure to make a contemporaneous objection to allegations of prosecutorial misconduct during closing arguments waived the issue for appeal); *see also Latiker v. State*, 918 So. 2d 68, 74 (¶ 14) (Miss. 2005) ("If a contemporaneous objection is not made, an appellant must rely on the plain error rule to raise the unpreserved argument on appeal.") (citing *Watts*, 733 So. 2d at 233). Second, "[w]hen the court sustains objections to improper testimony of witnesses . . . , it is presumed, unless otherwise shown, that the jury followed the directions of the trial judge to disregard such testimony." *Holifield v. State*, 275 So. 2d 851, 856 (Miss. 1973). Daner Ford fails to show otherwise and therefore has not overcome the presumption that a jury follows the instructions of a trial judge to disregard inadmissible testimony.

¶19. We hold that Ford's first assignment of error is without merit.

**II.      The trial court did not err in granting a flight instruction.**

¶20. Because Stuckett's murder occurred in the early morning hours of September 7, 2008, and because Daner Ford voluntarily went to the police department and gave a videotaped statement that same morning, Daner Ford contends that the trial court erred in giving a flight instruction to the jury. "We will overturn a trial court's giving of a jury instruction only where the trial court abused its discretion." *Drummer v. State*, 167 So. 3d 1180, 1186 (¶ 19) (Miss. 2015) (citing *Higgins v. State*, 725 So. 2d 220, 223 (¶ 15) (Miss. 1998)). "[J]ury instructions must be read 'as a whole with no one instruction taken out of context.'" *Id.*

9

(quoting *Jackson v. State*, 645 So. 2d 921, 924 (Miss. 1994)). However, "flight evidence is controversial and must be handled with care." *United States v. Benedetti*, 433 F.3d 111, 116 (1st Cir. 2005).

¶21. In general, "flight is admissible as evidence of consciousness of guilt." *Fuselier v. State*, 702 So. 2d 388, 390 (¶ 4) (Miss. 1997) (citing *Williams v. State*, 667 So. 2d 15, 23 (Miss. 1996)). That said, "an instruction that flight may be considered as a circumstance of guilt or guilty knowledge is appropriate" only under certain circumstances. *Reynolds v. State*, 658 So. 2d 852, 856 (Miss. 1995) (quoting *Fuselier v. State*, 468 So. 2d 45, 57 (Miss. 1985)). The Court has adopted a two-prong test for evaluating flight instructions: "(1) Only unexplained flight merits a flight instruction; and (2) flight instructions are to be given only in cases where that circumstance has considerable probative value." *States v. State*, 88 So. 3d 749, 758 (¶ 36) (Miss. 2012).

¶22. As to the first prong, Daner Ford has not provided an alternative explanation for why he hid in his mother's attic – thereby leaving as the only explanation that he was fleeing from arrest. By arguing that he had given a videotaped statement to police, Daner Ford intimates that there may have been a superseding cause for why he hid from the police, but he stops short of offering that cause. His omission is fatal to the instant assertion of error.

> Resolution of the issue [of flight instructions] requires an examination of the term "unexplained" in the context of flight evidence. It is only when the defendant fled for some reason independent of the crime that the flight is considered to be "explained." *Austin*[ *v. State*], 784 So. 2d [186, 194 (Miss. 2001)] (stating that "evidence of flight is inadmissible when independent reasons exist to explain the flight"). . . . Flight is "unexplained" if there is no explanation for it other than the defendant's guilt or guilty knowledge. *Austin*, 784 So. 2d at 194.

10

*Harrell v. State*, 134 So. 3d 266, 276 (¶ 34) (Miss. 2014). Daner Ford has failed to provide a "reason independent of the crime" to explain why he hid in the attic of his mother's house, rendering his flight "unexplained." As to the second prong, by the time the police had searched Daner Ford's mother's house, Daner Ford's family members and friends had been arrested and charged with Stuckett's murder. His own videotaped statement placed him with the persons who had been arrested for Stuckett's murder. His flight from police was, therefore, a "circumstance of considerable probative value."

¶23. Daner Ford's flight from police fits within the two-pronged test provided by *States* and *Harrell*. Additionally, the flight instruction did not require that the jury view Daner Ford's flight as evidence of guilt. The instruction read as follows:

> You will determine from all the facts whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things and give it such weight as you think it is entitled to in determining the guilt of [sic] innocence of the Defendant, DANER FORD.

The instruction permitted the jury to determine if Daner Ford had fled from the police, but advised that "such flight or hiding," and any guilty knowledge perceived therefrom, "is to be considered in connection with all other events in this case." Finally, the flight instruction was one of twenty-two instructions given to Daner Ford's jury. In dissent, Justice Lamar cites specially concurring opinions authored by former Justice Carlson, in which Justice Carlson wrote that flight instructions are limited to flight from the scene of the crime. (Lamar, J., dissenting, at ¶ 44). However, applicable caselaw approves the giving of flight instructions when the flight occurred to avoid arrest, whether it occurred from the scene of the crime or not. *See Warren v. State*, 709 So. 2d 415, 419-20 (Miss. 1998) (Defendant fled officer

11

attempting to question defendant at defendant's home after the crime in question occurred at another's residence); ***Brown v. State***, 690 So. 2d 276, 293-94 (Miss. 1996) (Defendant fled his workplace, which was not the scene of the crime, to avoid authorities after promising to remain to be available for questioning). We hold that the trial court did not abuse its discretion in giving a flight instruction to the jury for its consideration.

### III.  Daner Ford's trial counsel rendered effective assistance.

¶24.  Daner Ford alleges that he received ineffective assistance of counsel at his trial because his trial counsel improperly elicited testimony that Stevenson Ford already had been convicted of Stuckett's murder, and because his trial counsel failed to object to witness testimony about comments Daner Ford had made at Southern Whispers. The general practice of the Court while reviewing a defendant's direct appeal is to decline to address the merits of an ineffective-assistance claim. ***Archer v. State***, 986 So. 2d 951, 955 (¶ 15) (Miss. 2008). Daner Ford insists that the record is complete and ripe for review of a claim of ineffective assistance of counsel. We agree, and we hold that he received effective assistance of counsel and that the assignment of error is without merit.

¶25.  "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." ***Puckett v. State***, 879 So. 2d 920, 935 (¶ 43) (Miss. 2004) (quoting ***Strickland v. Washington***, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)) (internal quotations removed); *see also* ***Stringer v. State***, 454 So. 2d 468 (Miss. 1984) (applying the ***Strickland*** factors to a Mississippi criminal

12

appeal). The burden lies with the defendant to rebut the presumption that his trial counsel acted reasonably and strategically. *Wilcher v. State*, 863 So. 2d 776, 799 (¶ 42) (Miss. 2003) (citing *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984) (denying a federal petition for habeas corpus relief)). Specifically, a defendant must show (1) that his counsel's performance was deficient, and (2) that the deficiency prejudiced his defense. *Puckett*, 879 So. 2d at 935 (¶ 46). A defendant shows that he has been prejudiced by alleging, with specificity, that "but for such purported actions by ineffective counsel, the results of the trial court decision would have been different." *Ford v. State*, 708 So. 2d 73, 75 (Miss. 1998) (citing *Smith v. State*, 434 So. 2d 212, 219 (Miss. 1983)).

¶26. Daner Ford argues that his trial counsel rendered ineffective assistance of counsel when counsel elicited testimony from Lee that Stevenson Ford already had been found guilty for Stuckett's murder in a separate trial. "The general rule in this state is that where two or more persons are jointly indicted for the same offense, but are separately tried, a judgment of conviction . . . is not competent evidence on the trial of the other." *Robinson v. State*, 465 So. 2d 1065, 1068 (Miss. 1985). We have held that it is improper for the State to produce such evidence for the jury, as it prejudices the jury against the codefendant on trial. *McCray v. State*, 293 So. 2d 807, 808-09 (Miss. 1974). A review of the record reveals that, in the case *sub judice*, Daner Ford's trial counsel sought to elicit the testimony for the purpose of impeaching Lee, a witness for the State. At Stevenson Ford's trial, Lee had testified that he had seen Daner Ford shoot the rifle; now at Daner Ford's trial, Lee testified that he had seen

Daner Ford carrying the rifle and that he had heard shots, but that he did not actually see Daner Ford take the action of shooting the gun.

¶27.    On appeal, Daner Ford does not provide the Court with evidence from the record that the decision by his trial counsel was not strategic, and he therefore fails to rebut our strong and highly deferential presumption "that counsel's conduct fell within the wide range of reasonable professional assistance." *Hiter v. State*, 660 So. 2d 961, 965 (Miss. 1995). Further, Daner Ford has failed to show the Court that his counsel's alleged error prejudiced his defense. *See Puckett*, 879 So. 2d at 935 (¶ 46).

¶28.    Daner Ford also argues that his trial counsel erroneously withdrew an objection to witness testimony. Both Harmon and Smith testified that Daner Ford had made threats about potentially killing someone that night; Daner Ford's counsel did not object to Harmon's testimony and objected but then withdrew his objection to Smith's testimony. A review of the transcript shows that the repeated hearsay statements were admissions by a party-opponent under Mississippi Rule of Evidence 801(d)(2)(A)[2] and therefore admissible. Defense counsel's retraction of his objection to Smith's testimony and lack of objection to Harmon's testimony were in line with the Mississippi Rules of Evidence and did not constitute ineffective assistance.

¶29.    The assignment of error is without merit.

**IV.    The trial court did not err when it sentenced Ford as a habitual offender without first conducting a bifurcated sentencing hearing**.

---

[2]"A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . the party's own statement, either in an individual or a representative capacity[.]" M.R.E. 801(d)(2)(A).

14

¶30. Ford argues that the trial court erred when it sentenced Ford as a habitual offender because the trial court did not first conduct a bifurcated sentencing hearing. He alleges that the order to amend his indictment appeared spontaneously within the record and that the record contained no indication that his trial counsel was present, made any argument, or had any knowledge of the order to amend. Our review of the record reveals that the State made an in-chambers *ore tenu*s motion before trial and that Daner Ford and his defense counsel both were present.

¶31. When the State made its *ore tenus* motion, Daner Ford and his defense counsel both were present and both participated in the discussion. Defense counsel even admitted on the record that he represented Daner Ford in the cases that the State had presented to the judge as proof of Daner Ford's previous felonies. Defense counsel had an opportunity to object to the amendment of the indictment and did not do so. Defense counsel did not dispute the validity of the convictions. The text of the trial transcript soundly controverts Daner Ford's assertion that the order to amend his indictment appeared without a motion or hearing.

¶32. As to the issue of whether Daner Ford was entitled to a bifurcated trial, Mississippi Code Section 99-19-81 states that a person who has been twice convicted of

> any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of (1) year or more in any state and/or federal penal institution . . . shall be sentenced to the maximum term of imprisonment for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole of probation.

Miss. Code Ann. § 99-19-81 (Rev. 2015). For a habitual-offender sentence to be proper, all the Court requires is that the defendant be indicted as a habitual offender, that the State prove

15

the previous offenses by competent evidence, and that the defendant have reasonable opportunity to challenge the State's proof. *Grayer v. State*, 120 So. 3d 964, 969 (¶ 18) (Miss. 2013). The purpose of a bifurcated trial where a defendant has been indicted as a habitual offender "is to preclude jury knowledge of prior convictions, except as otherwise admissible." *Keyes v. State*, 549 So. 2d 949, 951 (Miss. 1989). By contrast, "the law strongly encourages, if it does not direct, the sentencing judge to become wholly familiar with the defendant's prior record before passing sentence." *Id.*

¶33. The Court has held that "[a] jury is to decide the question of guilt and subsequently the circuit judge is to serve as the finder of fact in determining whether the habitual offender part of the indictment is established by the requisite degree of proof." *Seely v. State*, 451 So. 2d 213, 215 (Miss. 1984). In the case *sub judice*, the jury returned a guilty verdict and then was dismissed from the courtroom. Only after their departure did the trial judge proceed to sentence Daner Ford. The trial judge asked if the defendant had anything to say before doing so. Further, the State reminded the trial judge about the habitual-offender amendment, and defense counsel did not object or contest the order during the time it took for the clerk to retrieve the amending order from the case file.

¶34. In *Carr v. State*, 178 So. 3d 344, 348-49 (¶¶ 10-12) (Miss. Ct. App. 2014), the defendant argued that the trial court had erred by not admitting his prior convictions into evidence after the departure of the jury. The Court of Appeals first noted that the lack of contemporaneous objection waived the issue on appeal, but went on to state that "Carr does not take issue with the admissibility of the convictions, only that the proper procedure was

not followed." *Id.* (¶ 12). The case *sub judice* is analogous. In the pretrial hearing, Daner Ford and his defense counsel stipulated to the validity of the prior convictions and do not now contest their admissibility, or the trial judge's consideration of them during the sentencing phase of his trial. Instead, he argues that he was not afforded a proper bifurcated hearing, which the trial transcript contradicts.

¶35. The assignment of error is without merit.

## CONCLUSION

¶36. The Court holds that none of the four issues Daner Ford asserts on appeal holds merit. The trial court did not abuse its discretion when it admonished the jury to disregard witness testimony rather than declare a mistrial. The trial court did not abuse its discretion when it granted a flight instruction to the jury. Daner Ford's allegations of ineffective assistance of counsel do not pass the two-pronged test prescribed by *Puckett*. Finally, Daner Ford's assertion that the trial court did not provide defense counsel the opportunity to object to his amended indictment as a habitual offender is factually incorrect. We affirm the convictions and sentences.

¶37. **COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT, AS A HABITUAL OFFENDER; CONVICTION OF ENHANCED BY A FIREARM AND SENTENCE OF FIVE (5) YEARS, AS A HABITUAL OFFENDER, TO BE SERVED CONSECUTIVELY TO THE MURDER CONVICTION, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF FELON IN POSSESSION OF A FIREARM AND SENTENCE OF TEN (10) YEARS, AS A HABITUAL OFFENDER, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNT II SHALL RUN CONCURRENTLY WITH THE SENTENCE OF FIREARM ENHANCEMENT AND CONSECUTIVELY TO THE SENTENCE OF MURDER.**

**APPELLANT SHALL PAY COURT COSTS IN THE AMOUNT OF $322 AND TWO (2) PERCENT BOND FEE.**

      **WALLER, C.J., RANDOLPH, P.J., MAXWELL AND BEAM, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J.; LAMAR, J., JOINS IN PART. LAMAR, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY DICKINSON, P.J., AND KITCHENS, J. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J.; LAMAR, J., JOINS IN PART.**

      **DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶38.    Even assuming that our so-called "flight instructions" would be appropriate in some cases, this is not one because Ford didn't flee. As Justice Kitchens and Justice Lamar astutely glean from the record, Ford voluntarily appeared at the police station to give a statement, after which he was informed he was free to leave. No evidence suggests that Ford later—or ever—was informed he was being pursued, and it seems fairly obvious to me that one cannot accidentally or unknowingly flee.

¶39.    I also agree with Justice Kitchens that our so-called "flight instructions" pose an unfair risk that the jury will convict an accused based on insufficient evidence. I pause here to point out a stark omission in the majority opinion. In quoting only a portion of the "flight" instruction at issue in this case, the majority fails to include the very language that, in my view, suggests that flight instructions should be abolished. The troublesome portion of the flight instruction omitted by the majority informed the jury that "'flight' is a circumstance from which guilty knowledge and fear *may be inferred*."[3] Instructions such as this permit

---

[3] Emphasis added.

18

juries to find the accused guilty based on a particular piece of evidence—standing alone—without consideration of other evidence or the elements of the crime.

¶40.    Suppose, for instance, in a prosecution for burglary, the State produced evidence that the accused broke into a building with the intent to steal, and then fled from police; but the State produced no evidence that the building was occupied—an essential element of the crime.  Relying solely on a flight instruction, jurors easily could conclude that—because the accused fled—they are allowed to "infer" that the accused is guilty.

¶41.    Furthermore, for reasons no majority of this Court has ever explained, this special inference-of-guilt instruction given for flight is not available for other kinds of evidence that, in many cases, present a far more compelling appearance of guilty.  For instance, consider a murder case where:

1.    the accused's fingerprints are found on the murder weapon;
2.    his DNA is found on the victim;
3.    an eyewitness testifies he committed the crime;
4.    a video shows him committing the crime;
5.    he confessed to the murder; and
6.    he fled the scene.

From this list of evidence, a majority of this Court approves allowing the trial judge to pick flight—and only flight—for a special instruction that allows the jury to infer guilt.  One wonders whether this Court would affirm a conviction based on evidence of flight, and nothing else.

¶42.    For these reasons, I join Justice Kitchens's dissent in full, and I agree with Justice Lamar that Ford's conviction should be reversed.

19

**KITCHENS, J., JOINS THIS OPINION. LAMAR, J., JOINS THIS OPINION IN PART.**

**LAMAR, JUSTICE, DISSENTING:**

¶43. I do not join Justice Kitchens's call to abolish flight instructions altogether, but I agree with him that granting the instruction here was error. Ford did not flee the crime scene immediately after committing the alleged crime. On the contrary, he voluntarily presented himself at the police station and gave a recorded statement just hours after the shooting. The flight instruction here was based solely on the evidence that Ford was found in his mother's attic when the police arrested him some eight days later. And although this Court has approved the grant of a flight instruction under similar circumstances, I find the instruction here to be both an improper comment on the evidence and an unwise extension of the use of flight instructions altogether.

¶44. I joined Presiding Justice Carlson's special concurrence in *Sanders v. State* where he emphasized that flight instructions are appropriate only when a defendant has fled the scene of the crime:

> The purpose of the flight instruction is to inform the jury that it might consider the defendant's *flight from the scene immediately after the commission of the crime* as a circumstance from which guilty knowledge might be inferred. While the prosecution understandably might wish to present evidence of a defendant's extended absence from the state and argue that fact to the jury (which the prosecutor would have every right to do, especially since the jury would be curious as to why it had taken more than twenty years after the crimes to bring a defendant to trial), *the flight instruction in today's case was appropriate only to the extent of allowing the jury's consideration of the fact that Sanders had fled the scene of the crime immediately after the commission of the crimes.* The difference in what the prosecutor can do, and what the trial judge can do via a written instruction to the jury, is the cold hard fact that when a trial judge instructs the jury on such matters as a defendant's flight,

such action only "heightens the importance of the evidence [of flight] in the eyes of the jury." ***Randolph***, 852 So. 2d [547,] . . . 568 [Miss. 2002] (Carlson, J., concurring).

***Sanders v. State***, 63 So. 3d 497, 510 (Miss. 2011) (Carlson, P.J., specially concurring) (emphasis added). This case also presents that problematic extension of the flight instruction. As such, I would reverse the judgment and remand this case for a new trial.

**DICKINSON, P.J., AND KITCHENS, J., JOIN THIS OPINION IN PART.**

**KITCHENS, JUSTICE, DISSENTING:**

¶45. I respectfully dissent for two reasons. First, I find that the flight instruction was not warranted in this case. Second, as I previously have written, I would abolish the flight instruction altogether.

¶46. In the present case, Instruction S-7 informed the jury:

> [T]hat "flight" is a circumstance from which guilty knowledge and fear may be inferred. If you believe from the evidence in this case beyond a reasonable doubt that the Defendant, DANER FORD, did flee or go into hiding, such flight or hiding is to be considered in connection with all other events in this case. You will determine from all the facts whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things and give it such weight as you think it is entitled to in determining the guilt of [sic] innocence of the Defendant, DANER FORD.

Ford objected at trial to Instruction S-7, arguing that the fact police were searching for Ford days after the crime did not constitute an evidentiary basis to warrant a flight instruction: "Because he doesn't turn himself in, because he's not readily apparent when [the police are] looking for him, doesn't mean he was in flight." I agree.

¶47. The majority correctly relates that "(1) [o]nly unexplained flight merits a flight instruction; and (2) flight instructions are to be given only in cases where that circumstance

21

has considerable probative value." **States v. State**, 88 So. 3d 749, 758 (Miss. 2012) (citations omitted). But, more fundamentally, "[o]ur law is well-settled that jury instructions are not given unless there is an evidentiary basis in the record for such." **Fairchild v. State**, 459 So. 2d 793, 800 (Miss. 1984) (citing **Colburn v. State**, 431 So. 2d 1111, 1114 (Miss. 1983)).

¶48.    In **Pannell v. State**, this Court reversed an aggravated assault conviction because "there is absolutely no foundation in the record before us on which to base a flight instruction." **Pannell v. State**, 455 So. 2d 785, 788 (Miss. 1984). The Court observed that:

> Charles Pannell testified that following the shooting he dropped off his sister at her home and went directly to another sister's home with whom he had been staying. Once there, he immediately phoned the sheriff's office to report the incident. Pannell then made an unsuccessful attempt to contact his attorney. The following morning after Pannell had the opportunity to discuss the matter with his attorney, and after that attorney spoke with the sheriff, Pannell voluntarily surrendered. Pannell's explanation for his departure from the scene of the shooting was wholly uncontradicted and certainly not incredulous or unbelievable. Charles Pannell's flight, if it was such, was completely explained and under the facts of this case no flight instruction was warranted.

*Id.*

¶49.    In **Anderson v. State**, the Mississippi Court of Appeals distinguished **Pannell** by finding that the State had "offered evidence tending to show that Anderson attempted to avoid law enforcement authorities for a three-and-a-half-month period, including the day of his arrest." **Anderson v. State**, 1 So. 3d 905, 915-16 (Miss. Ct. App. 2008), *cert. denied*, 999 So. 2d 1280 (Miss. 2009)). After the crime itself, police "were unable to determine Anderson's whereabouts even though they checked his residence, as well as neighborhoods and other locations where he was known to be seen." *Id.* at 916. A confidential informant reported "that Anderson had 'skipped town' and gone to Tennessee." *Id.* Three months later,

22

another confidential informant notified police that Anderson had returned to Greenwood and, ultimately, Anderson was located hiding underneath a house. *Id.* The court found a flight instruction to have been warranted because, unlike in *Pannell*, Anderson's "flight was never fully explained." *Id.*

¶50.    The majority finds that Ford "has failed to provide a 'reason independent of the crime' to explain why he hid in the attic of his mother's house, rendering his flight 'unexplained.'" (Maj. Op. ¶ 22) (citing *Harrell v. State*, 134 So. 3d 266, 276 (Miss. 2014) ("Harrell's flight from Jackson to dispose of the body in Holmes County was unexplained by anything other than guilt or guilty knowledge.")). But the State is not entitled to a flight instruction unless an evidentiary foundation exists in the record to support its giving. And not a shred of evidence exists in this record to suggest that Ford fled from the crime scene.

¶51.    As the majority recognizes, during the day of September 7, 2008,[4] Ford appeared at the police station and gave a recorded statement, after which he was free to leave. Warrants for the arrest of Ford and his fellow suspects were issued on September 8, 2008. A twenty-four-hour surveillance was set up outside Ford's mother's house, and a trap-and-trace device, which tracks signals from cellular telephones, was activated on September 11, 2008. Ford's lawyer was unable to get in touch with him. On September 15, 2008, a signal from Ford's cellular telephone was received and, after receiving permission to search Ford's mother's house, law enforcement located and apprehended Ford in the attic.

---

[4] The alleged crime took place in the early morning hours of September 7, 2008.

23

¶52.    As in ***Pannell***, in which Pannell reported the incident to police, Ford reported, of his own volition, to the police station and gave a recorded statement. After giving the statement, Ford left the police station a free man. No evidence exists that the police informed him at that time that he was a suspect and ought to remain at hand to be arrested in the event of his being charged. This case is unlike ***Anderson***, in which Anderson fled *the scene of the crime* and disappeared for three-and-a-half months prior to his apprehension and, according to a confidential informant, "skipped town." Ford left the crime scene and went to the police station. The State recognizes that "the authorities were only able to find Ford after he turned on his cellular telephone and they traced the phone to his mother's house." But merely because Ford's phone was turned off and the police, consequently, were unable to locate him is not evidence that he fled the scene of the crime, much less that he fled arrest, because there is no evidence that he was aware a warrant had been issued for his arrest. Ostensibly, Ford went to the home of his mother after leaving the police station on September 7, 2008, and remained there until the point of his apprehension by police.

¶53.    Even more troubling is the majority's finding that this is a case in which the circumstance of Ford's purported flight has considerable probative value. The majority supports that finding by saying, first, that "by the time that the police searched Daner Ford's mother's house, Daner Ford's family members and friends had been arrested and charged with Stuckett's murder."  (Maj. Op. ¶ 22). Second, according to the majority, Ford's "own videotaped statement placed him with the persons that had been arrested for Stuckett's

24

murder." (Maj. Op. ¶ 22). Consequently, the majority concludes that Ford's flight was a "'circumstance of considerable probative value.'" (Maj. Op. ¶ 22).

¶54. This Court considered whether a flight instruction was warranted in a case in which "the 'hiding' at the time of arrest occurred more than *three weeks* after the armed robbery." *Ervin v. State*, 136 So. 3d 1053, 1060 (Miss. 2014) (emphasis in original). The Court found that "no evidence exists that Charles [Ervin] knew for what charges law enforcement officers came to arrest him; and Charles 'fled' or 'hid' in his own attic, which had no exit, for a few moments while his girlfriend informed law-enforcement officials of his whereabouts." *Id.* The Court continued:

> We question whether evidence of flight in this case, where the defendant hid in his own attic (with no exit) from law-enforcement agents during an arrest for a crime that occurred three weeks prior, while the "escapee" had no knowledge of the crime for which he was being arrested, is remotely probative of guilt, much less considerably probative of guilt. Courts should examine the facts of each specific case when considering a flight instruction; however, the longer the time period between the crime and the flight, the more arduously a court should scrutinize its probative value. *See United States v. Myers*, 550 F.2d 1036, 1051 (5th Cir.1977) ("The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense.").

*Id.*

¶55. The Court ultimately reversed *Ervin* on a separate issue, but noted that it "need not decide the issue of whether the flight instruction was error; however, because the issue may arise on remand, we note the questionable wisdom of granting it." *Id.* at 1059-60. The Court then cited some language from separate opinions in prior cases expressing judicial reservations regarding the granting of flight instructions:

25

"[T]he use of the flight instruction in this state can be described in one word—'dangerous.'" ***Randolph v. State***, 852 So. 2d 547, 567 (Miss. 2002) (Carlson, J., specially concurring, joined by Smith, P.J., Waller, and Cobb, JJ.). "[A] trial court, by giving a flight instruction, simply puts itself in a position of possibly placing a reversible error in an otherwise clean record. If a trial court persists in giving a flight instruction, . . . it [should] do so with great caution." ***Id.*** "[W]ith the prosecutors having been duly warned on multiple occasions about the danger of submitting flight instructions, there can be no legitimate hue and cry from the State in the future if this Court . . . reverses a criminal conviction based on the trial court's improper grant of a flight instruction, which had been improvidently submitted by the prosecutor." ***States v. State,*** 88 So. 3d 749, 759 (Miss. 2012) (Carlson, P.J., Specially Concurring[, joined by Waller, C.J., Dickinson, P.J., Lamar and Chandler, JJ.]).

*Id.* at 1060.

¶56. The present case resembles ***Ervin*** because of the absence of evidence that Ford was aware that he was being sought by the authorities, or that he knew for what charges law enforcement officers had come to arrest him, at the time he was located by the police in his mother's attic. The fact that family members and friends of Ford had been arrested at the time of his apprehension, and the fact that Ford's videotaped statement (which, let us not forget, he volunteered the day the crime took place at the police station) connects him to those persons is not, as the majority claims, "a circumstance of considerable probative value." This Court has noted the definition of "probative" as "tending or serving to prove." ***Anderson v. State***, 185 So. 3d 966, 970 (Miss. 2015) (quoting Bryan A. Garner, *A Dictionary of Modern Legal Usage* 694 (2d ed. 2001)).

¶57. The circumstance—that, following Ford's leaving the police station, the police were unable to locate him and, ultimately, after Ford activated his cellular telephone, they apprehended him in his mother's attic—cannot be described as one of "considerable

26

probative value" that would warrant a flight instruction. It certainly is not, as the jury was informed, "a circumstance from which guilty knowledge and fear may be inferred." As in *Ervin*, I question whether the circumstance here "is remotely probative of guilt, much less considerably probative of guilt." *Ervin*, 136 So. 3d at 1060. Ford's appearance at the police station on the day of the crime constitutes a material intervening factor that belies any basis for the giving of a flight instruction in this case.

¶58.    "It is impossible for this Court to know whether the jury was unduly influenced or confused by the erroneous flight instruction. To conclude that the defendant was not prejudiced as a result of the improper instruction is purely speculative." *States*, 88 So. 3d at 760 (Kitchens, J., dissenting). Because the flight instruction in this case was given absent a sufficient evidentiary foundation, I would reverse and remand this case to the Circuit Court of Washington County for a new trial.

¶59.    I reiterate that instructing a jury that it may infer guilt from what is, at best, circumstantial evidence of flight, in effect relieves the State of its burden of proving every material element of the crime charged beyond a reasonable doubt. I would abolish the flight instruction and hold that its use in future cases is *per se* reversible error. *See **Drummer v. State***, 167 So. 3d 1180 (Miss. 2015) (Kitchens, J., dissenting from part II).

**DICKINSON, P.J., AND KING, J., JOIN THIS OPINION. LAMAR, J., JOINS THIS OPINION IN PART.**