# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00461-COA

| | |
|---|---|
| **DAMEION STEWART A/K/A DAMEON STEWART** | **APPELLANT** |

**v.**

| | |
|---|---|
| **STATE OF MISSISSIPPI** | **APPELLEE** |

| | |
|---|---|
| DATE OF JUDGMENT: | 03/13/2023 |
| TRIAL JUDGE: | HON. ELEANOR JOHNSON PETERSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/14/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**EMFINGER, J., FOR THE COURT:**

¶1.    Dameion Stewart was indicted by a Hinds County grand jury on one count of armed carjacking and three counts of armed robbery pursuant to Mississippi Code Annotated sections 97-3-117 (Rev. 2014) and 97-3-79 (Rev. 2014), respectively. He was convicted of all four counts and sentenced to a term of twenty years in the custody of the Mississippi Department of Corrections for each count, with ten years suspended and ten years to serve for each count, all set to run concurrently, followed by three years of post-release supervision. After the denial of his post-trial motions, Stewart appealed.

**FACTS AND PROCEDURAL HISTORY**

¶2.     Latrice Powell rented a vehicle and traveled from her home in White Plains, Maryland, to Jackson, Mississippi, where her sister Quanda Odom lived at 135 Wichita Drive.[1] She was visiting Odom for the Christmas holiday. On December 27, 2016, Powell testified that she, Odom, and her aunts Sarah Hicks and Mozella Page went shopping at Northpark Mall and then went to a movie. After the movie ended, Powell dropped Page off at her home in Jackson, and the other three stopped at Krystal to eat.

¶3.     When they arrived at Odom's home, they parked the car. Powell parked in the grass so Odom would not have to wake her up to move her car the next day when Odom left for work. When Odom exited the vehicle, Powell said they were "just, you know, talking back and forth, laughing and talking and trying to grab all of [their] items." When Powell stepped out of the car, Hicks, who was still in the back seat, told Powell to "get back in the car." Powell testified that she put her feet back into the car, pulled the door closed a little, and said, "[L]ike, [w]hat's wrong with you," to Hicks, thinking she was "just being funny."

¶4.     Powell testified that someone then opened the door, pulled her out, and put a gun to her right temple. The person told Powell, "[G]ive me the keys, bitch!" As he continued to ask for the keys, Powell asked him, "[W]hy are you doing this?" The perpetrator yelled at her, "[S]hut up bitch!" Powell testified that Odom was outside the car struggling with a second perpetrator, and Hicks was in the back seat of the vehicle struggling with a third person. After the perpetrators fled in Powell's rental car, the women called 911, and officers with the

_____

[1] The rental vehicle was a 2017 silver Toyota Corolla with Colorado license plates.

Jackson Police Department (JPD) came to Odom's home that night.

¶5.     Tefletcher White, the first JPD officer on the scene, spoke only with Powell on the night of the crime. She related to him the events outlined above. At trial he testified that 135 Wichita Drive is in the First Judicial District of Hinds County, Mississippi. He stated that the report was called in at 11:02 p.m. and, according to his report, the crime took place between 10:45 and 11 p.m. that night. White told the jury he had been advised that shopping bags, Powell's purse, a cell phone, and other items were in the vehicle when it was taken. While he did not get a detailed description of the perpetrators, he was told there were three black males involved in the attack.

¶6.     While Powell spoke with the officers on the night of the crime, she did not write a statement at that time. Powell later contacted JPD because her cell phone, which had been left in the stolen vehicle, was "pinging with find my iPhone." She informed the officers that the service was telling her where her phone was in Jackson. She also informed JPD that her debit card had been used and where it was used.[2]

¶7.     On December 29, 2016, Justin Roberts, then a patrol officer for JPD, was dispatched to 1633 Chapman Drive in Jackson in reference to a suspicious vehicle parked at the back of a residence.[3] Roberts spoke with the homeowner, Eurkisha Stewart, who advised Roberts that a vehicle she did not recognize was in her backyard. Since no one in her home had any

---

[2] Lead detective Melvin Williams testified that he was unable to find the location of the cell phone, but he discovered the credit cards were used at two locations on McDowell Road.

[3] Chapman Drive is in the Second Judicial District of Hinds County.

3

knowledge of the car or why it was there, she called 911. When Roberts ran the tag number and vehicle identification number, he found that the vehicle had been stolen and that the license plate had been switched. The license plate that should have been on the vehicle was GQU774, a Hertz rental vehicle. Roberts discovered that Eurkisha and her sons, Dameion and Carlos Stewart, lived at the residence along with other family members. Roberts also learned that it was Stewart's daughter who alerted her mother to the suspicious vehicle. A wrecker company was called to take the vehicle to the JPD mobile crime lab for further investigation.

¶8.    Detective Williams met with the three victims on December 30, 2016, the day after the vehicle was discovered. Williams had called the juvenile division to see if anything came up on Carlos Stewart but "wasn't able to get anything." Williams found a photo of Stewart and generated the photo through CISCO. Williams prepared a "six-man non-suggestive photo lineup," which included Stewart's photo.

¶9.    Williams showed each of the ladies the photo lineup. He first showed it to Powell and Odom. Both were unable to make an identification. Williams then testified:

> At that time I called Ms. Sarah Hicks, and I gave it to her and I stepped away from her. Ms. Hicks immediately said, "That's him right there." I turned around and looked at her. I said, "Are you sure you see him?" She say, "Yes." She say, "That's the one I was fighting with and kicking while I was in the back seat."

Once Hicks had identified Stewart, Williams took the photo lineup, logged it into evidence, and "immediately did a[n] underlying facts and bench warrant." The arrest warrant was signed, and Stewart was arrested that evening.

4

¶10.    At trial, Odom and Hicks corroborated Powell's testimony about the events of December 27, 2016. The prosecution also called Andrew Harris, a crime scene investigator, who testified that he collected evidence, documented the evidence, and took photographs. He testified that he was able to lift some fingerprints from the door of the rental vehicle.[4] Joe Heflin, a forensic biologist specializing in DNA analysis at the Mississippi Forensics Laboratory in Pearl also testified. He explained his primary duty is to "test items of evidence to try to develop DNA profiles from items at a crime scene and also develop profiles from reference samples from individuals and then compare those profiles to see whose DNA was left at a crime scene." However, Heflin found nothing of evidentiary value.

¶11.    After the State rested its case-in-chief, the defense moved for a directed verdict, which the trial court denied. The defense then called four witnesses. Eurkisha, Stewart's mother, testified that on the day of the crime, her sister had called and wanted Stewart to come to her house in Eurkisha's truck to help with some yard work. Later that evening, around 7 p.m., Eurkisha called her sister to see if Stewart was still there because she needed the truck to go pick up some takeout food she had ordered. According to Eurkisha, when she returned home close to 8 p.m., Stewart was still at home. Eurkisha testified that around 10 p.m. that evening, Stewart left to pick up food from Taco Bell but was gone no more than thirty or forty minutes. She told the jury that to her knowledge, he did not leave the house after that.

---

[4] The defense called Patricia Jackson, who, at the time of the incident, was a fingerprint analyst for JPD. She testified she examined only one latent print from the driver's side door, and it did not match Stewart.

¶12.    Tyeisha Stewart, Stewart's sister, confirmed Eurkisha's testimony, testifying that she was positive that Stewart did not leave the house that night. She did not recall his trip to Taco Bell. On cross-examination, the State admitted Tyeisha's statement from February 2023 in which she stated Stewart was home all day and did not mention his time at the aunt's house doing yard work.

¶13.    Finally, Stewart testified in his own defense. He testified about helping his aunt with yard work and his trip to Taco Bell. Stewart testified that he saw the car in the backyard but that he had nothing to do with the vehicle. He further testified that he did not steal the car and did not carjack the ladies who had testified.

## ANALYSIS

I.    **Whether the trial court erred in denying Stewart's motion for a mistrial.**

¶14.    In *Young v. State*, 281 So. 3d 179, 186 (¶29) (Miss. Ct. App. 2019), this Court repeated the standard of review of the denial of a mistrial:

> "The standard of review for the denial of a mistrial is abuse of discretion." *Ambrose v. State*, 254 So. 3d 77, 116 (¶112) (Miss. 2018). "A trial judge need declare a mistrial only when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Hutto v. State*, 227 So. 3d 963, 984 (¶66) (Miss. 2017).

¶15.    In the present case, during the State's cross-examination of Eurkisha, Stewart's mother, the following exchange occurred:

Q. Now, you say you have a son by the name of Carlos Stewart?

A. Yes, ma'am, I do.

Q. Back in 2016, how old was Carlos?

A. 2016 he was 14, I believe.

Q. He was 14?

A. Yes, ma'am.

Q. Now, isn't it true that last year he died in a stolen car?

MR. HARRISON: Objection, Your Honor.

THE COURT: Sustained.

MR. HARRISON: Your Honor, may we approach?

THE COURT: You may. You know what, I need to take this up outside the presence of the jury. And, Ms. Stewart, I'm going to ask the bailiff to let you go. Let me take the jury out, please.

THE BAILIFF: All rise.

(THE JURY WAS EXCUSED FROM THE COURTROOM AND THE FOLLOWING PROCEEDING[S] WERE HAD OUTSIDE THE PRESENCE AND HEARING OF THE JURY:)

THE COURT: I can tell you without hearing anything from either side, that objection is sustained. I cannot see any reason why that would be relevant to what happened in 2016, and we're not going to go down this road.

MS. HARRIS: Yes, Your Honor. I won't ask anything further.

THE COURT: You shouldn't have even asked the question the first time, Counselor, and had I known that that was an issue I would have instructed you all beforehand not, that that would not be a suitable or permissible area of cross-examination because it had nothing to do with what happened in 2016. And I hope that there are no other questions of that nature going to come up.

MS. HARRIS: No, ma'am.

THE COURT: All right. I'm going to give her a minute to compose herself.

MR. HARRISON: I [am] going to have to move for a mistrial at this point, Judge.

7

THE COURT: Denied.

MR. HARRISON: Can I just make a record.

THE COURT: I'll instruct the jury to ignore that question, but you can make your record if you want to. It's enough for me to – it was an irrelevant question, but you may make your record.

MR. HARRISON: Your Honor, I think it was an intentional act on behalf of the State. There is no rational reasonable basis to even cover that on cross-examination. And the jury can't – I mean, I know this Court has heard the argument that you cannot un-ring a bell, and that is this case a stolen car, and you can't un-ring a bell at this point. And on that basis, I would ask for a mistrial.

THE COURT: So noted. Motion denied. The Court does not find that that's a good enough basis to deny the jury the opportunity to hear the case or that it would be so prejudicial to the jury.

¶16. Stewart argues on appeal that the State's conduct was intentional and that it created "substantial and irreparable prejudice." He contends that there was no reasonable basis for the State to ask the question and that the trial court erred by denying his motion for a mistrial. Stewart points out that the trial court found that the question was improper but determined that any damage could be cured by instructing the jury to disregard the question. However, when the jury came back into the courtroom, the trial court did not give the jury the instruction to disregard the question. Stewart thus contends that the trial court abused its discretion and that a reversal of the convictions is appropriate.

¶17. The State counters by arguing that the trial court immediately sustained the defense's objection to the prosecutor's question before the question was answered. Therefore, according to the State, Stewart suffered no prejudice. The State further argues that although the trial court did not give an immediate instruction to the jury to disregard the question, the

8

court's instructions to the jury at the conclusion of the case were sufficient to cure any prejudice the question itself may have caused.

¶18.    We find that the trial court did not err by denying Stewart's motion for a mistrial based upon the question asked by the prosecutor.  In *West v. State*, 378 So. 3d 422, 429 (¶20) (Miss. Ct. App. 2023), we explained:

> "[Caselaw] unequivocally holds that the trial judge is in the best position for determining the prejudicial effect of an objectionable remark." *Edwards v. State*, 305 So. 3d 1186, 1190 (¶10) (Miss. Ct. App. 2020) (quoting *Wilson v. State*, 102 So. 3d 1200, 1205 (¶20) (Miss. Ct. App. 2012)). "The judge is provided considerable discretion to determine whether the remark is so prejudicial that a mistrial should be declared." *Id*. In addition, "Mississippi law places the burden upon counsel to request that the court issue such an admonition and conduct . . . a polling after an improper comment is made . . . ." *Lee v. State*, 910 So. 2d 1123, 1127 (¶16) (Miss. Ct. App. 2005). . . . "[I]f the lower court rules that a statement was improper, the lower court must then admonish the jury to disregard the statement, unless the statement caused serious and irreparable damage; in that case, the trial judge may grant a mistrial." *Id*. at 1128 (¶17). From the outset, however, the duty remains with "opposing counsel . . . to object promptly and to 'insist' that the judge rule on the issue and admonish the jury." *Id*. (quoting *Johnson* [*v. State*], 477 So. 2d [196,] 210 [(Miss. 1985)]).

¶19.    The record is clear that the trial court immediately sustained the defense's objection to the prosecutor's question in the presence of the jury before the question could be answered.  While the court indicated it would instruct the jury to disregard the question, when court reconvened, the jury was not so instructed. However, defense counsel did not remind the court or insist on an immediate instruction to disregard.

¶20.    While the question about Stewart's younger brother was not relevant to the present case, it was not as potentially prejudicial as comments in other cases. In *Murshid v. State*, 326 So. 3d 489, 495 (¶10) (Miss. Ct. App. 2021), a State's law enforcement witness testified that

9

the defendant previously had been arrested by the Drug Enforcement Administration. The defense objected and moved for a mistrial. *Id*. The trial court sustained the objection but denied the motion for a mistrial. On appeal this Court found as follows:

> After our review, we find no abuse of discretion in the circuit court's denial of Murshid's motion for a mistrial. "[A] trial judge is best suited to determine the prejudicial effect of an objectionable remark and is given considerable discretion in deciding whether the remark is so prejudicial as to merit a mistrial." *Young v. State*, 264 So. 3d 797, 805 (¶19) (Miss. Ct. App. 2018) (quoting *Ford v. State*, 206 So. 3d 486, 491 (¶14) (Miss. 2016)). Our review of the record reflects no evidence that Agent Creel's single reference to Murshid's 2013 arrest substantially or irreparably prejudiced Murshid's case. The State never sought to elicit improper testimony from Agent Creel, and Murshid's attorney objected to the remark before Agent Creel revealed the nature of the prior charge. In addition, at the conclusion of Murshid's trial, the circuit court properly instructed the jurors that they should disregard any statements that were inadmissible and lacked a basis in the evidence. In relevant part, the circuit court instructed the jury as follows:

>> The evidence which you are to consider consists of the testimony and statements of the witnesses and the exhibits offered and received.
>> . . . .
>> If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement[,] or remark.
>> . . . .
>> You are to disregard all evidence which was excluded by the court from consideration during the course of the trial.

> Thus, the record reflects that the circuit court properly instructed the jury to only consider admissible testimony with a basis in the evidence. Moreover, we presume that the jury follows the court's given instructions. *Williams v. State*, 288 So. 3d 412, 415 (¶12) (Miss. Ct. App. 2020). We therefore find that this issue lacks merit.

*Id*. at 500 (¶33). Prior to closing arguments in the case at bar, the jury was given similar

10

instructions, which stated, in part:

> You should not be influenced by bias sympathy of prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork or conjecture.
>
> . . . .
>
> The evidence which you are to consider consists of the testimony and statements of the witnesses and the exhibit(s) offered and received.
>
> . . . .
>
> Arguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law, but they are not evidence.
>
> . . . .
>
> You should not speculate as to possible answers to questions which I did not require to be answered. Further, you should not draw any inference from the content of these questions.
>
> . . . .
>
> You are to disregard all evidence which I excluded from consideration during the course of the trial.

¶21. We find that the trial court did not err by denying Stewart's motion for a mistrial. We also find that Stewart waived any error by the trial court in failing to immediately instruct the jury to disregard the prosecutor's question by failing to remind or insist that the trial court give the instruction. In any event, any harm caused by the question was cured by the instructions given by the trial court prior to jury deliberations.

> **II. Whether the trial court erred in allowing Officer Roberts to testify via closed-circuit television violated Stewart's right to confront a witness.**

¶22. At the time of the offense, Roberts was a JPD patrol officer, but at the time of trial, he was employed by the Prentiss Police Department. The day before trial, attorneys for the State and their investigator learned that Roberts wanted to testify remotely. Roberts explained

11

that he was working a shift from 6 p.m. to 6 a.m. the night before his testimony was to be offered, and he said his travel time would be sixty miles one way.

¶23. When informed of the State's intention to present Roberts' testimony via livestream, defense counsel objected, arguing that he had received no notice. The trial court instructed the State to file a notice regarding Roberts' remote testimony. The notice was filed that day. When trial began, the trial court announced that it had reviewed the notice and found good reason to allow Roberts to "proceed closed circuit." Defense counsel again objected, citing only "improper timing, improper notice."

¶24. For the first time on appeal, Stewart complains that his Sixth Amendment rights under the Confrontation Clause of the Constitution were violated because "the trial court failed to make findings of necessity and reliability required by the United States Supreme Court in *Maryland v. Craig*, 497 U.S. 836, 850 (1990)." In *Craig*, 497 U.S. at 836-37, the Supreme Court held:

> The Confrontation Clause does not guarantee criminal defendants an *absolute* right to a face-to-face meeting with the witnesses against them at trial. The Clause's central purpose, to ensure the reliability of the evidence against a defendant by subjecting it to rigorous testing in an adversary proceeding before the trier of fact, is served by the combined effects of **the elements of confrontation: physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.** Although face-to-face confrontation forms the core of the Clause's values, it is not an indispensable element of the confrontation right. If it were, the Clause would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme, *Ohio v. Roberts*, 448 U.S. 56, 63 [(1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004)]. Accordingly, the Clause must be interpreted in a manner sensitive to its purpose and to the necessities of trial and the adversary process. *See, e.g.*, *Kirby v. United States*, 174 U.S. 47 [(1899)]. Nonetheless, the right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such

12

confrontation is **necessary** to further an important public policy and only where the testimony's **reliability** is otherwise assured. *Coy* [*v. Iowa*, 487 U.S. 1012,] 1021 [(1988)].

(Italics in original) (bold emphasis added).

¶25.    In *Stevenson v. State*, 357 So. 3d 1141, 1148 (¶23) (Miss. Ct. App. 2023), we explained our standard of review in cases dealing with constitutional issues:

> "Constitutional issues are reviewed de novo." *Buchanan v. State*, 316 So. 3d 619, 624 (¶18) (Miss. 2021). "[I]f a confrontation clause violation is found, the violation is subject to a harmless-error analysis." *Sanders v. State*, 228 So. 3d 888, 890 (¶8) (Miss. Ct. App. 2017) (citing *Conners v. State*, 92 So. 3d 676, 684 (¶20) (Miss. 2012)). "Where the improperly admitted evidence is largely cumulative of other evidence before the jury, and the evidence presented against the defendant, taken as a whole, is overwhelming, the error may be harmless." *Id*. at 891 (¶13).

¶26.    We considered whether an adult witness's testimony via two-way live video violates the Confrontation Clause for the first time in *Stevenson*, 357 So. 3d at 1149 (¶27). Prior to *Stevenson*, our appellate courts had only addressed Confrontation Clause violations regarding the testimony of minors via live video. Due to the lack of Mississippi precedent, this Court went through a lengthy analysis of cases from other jurisdictions that had considered adult witness testimony via two-way live video. *Id*. at 1149-53 (¶¶27-39).

¶27.    Stewart did not raise a Confrontation Clause objection at trial or in his post-trial motions. "As a general rule, if not asserted at the trial level, constitutional questions are waived or forfeited." *Id*. at 1148-49 (¶24) (citing *Rogers v. State*, 928 So. 2d 831, 834 (¶24) (Miss. 2006)). Because of that failure, Stewart is procedurally barred from bringing that argument on appeal. *Id*.

¶28.    The procedural bar aside, in *Stevenson*, 357 So. 3d at 1154 (¶43), this Court found that

the reliability prong of *Craig* was satisfied, but the necessity prong was not satisfied. Finding

Stevenson's rights were violated, this Court stated:

> We are not holding that remote testimony violates the Confrontation Clause per se. Instead, we hold that such testimony may be allowed if the trial court makes the requisite finding of necessity as well as reliability. In this case, the reliability prong of the Craig test was clearly satisfied because **Stevenson had the opportunity to extensively cross-examine Dr. Funte, make contemporaneous objections, and receive rulings in real-time; further no technical difficulties were noted in the record.** But, despite the fact that the reliability prong was satisfied, the circuit court failed to make the required finding of necessity, thus Stevenson's rights were violated. This error, however, was harmless as we will further discuss below. Thus, to reiterate, when a court makes the requisite findings of both necessity and reliability, such remote testimony is permitted.

*Id*. (emphasis added). Once it was established that Stevenson's rights were violated, the

Court conducted a harmless-error analysis.

¶29. In the present case, we find that the trial court here satisfied the reliability prong of

the *Craig* test because via the two-way live video, Stewart had the opportunity to

cross-examine Roberts, make contemporaneous objections, and receive rulings in real-time,

and no technical difficulties were noted in the record. However, as in *Stevenson*, the trial

court failed to make any finding of necessity and, as a result, erred by permitting Roberts to

testify remotely.[5] We now have to determine whether Stewart was harmed by the error. In

conducting its harmless error analysis in *Stevenson*, this Court explained:

> "[W]here the improperly admitted evidence is largely cumulative of other evidence before the jury, and the evidence presented against the defendant, taken as a whole, is overwhelming, the error may be harmless." *Sanders v.*

---

[5] In most cases, jurors and witnesses have to miss work to attend court. While there may be an unusual case where it is necessary for a witness to testify remotely, that finding of necessity should be made by the trial court, on the record, with prior notice to all parties.

*State*, 228 So. 3d 888, 891 (¶13) (Miss. Ct. App. 2017). "Errors are not harmless if they resulted in a manifest miscarriage of justice against the defendant." *Id*. Relevant factors in determining whether an error is harmless or prejudicial include "whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged." *Jones v. State*, 287 So. 3d 995, 1011 (¶55) (Miss. Ct. App. 2019). "Whether a violation of the confrontation clause in a particular case may be classified as harmless error depends upon a number of factors." *Raiford v. State*, 907 So. 2d 998, 1004 (¶15) (Miss. Ct. App. 2005) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

> These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id*. at 1154-55 (¶44).

¶30. Roberts, a patrol officer, was not called to the crime scene. His only involvement was when he was dispatched on December 29, two days after the incident, to 1366 Chapman Drive in response to Eurkisha's 911 call regarding the suspicious vehicle in her yard. Roberts did not interview the victims or any suspects regarding the alleged crime. Eurkisha's testimony mirrored the testimony Roberts gave. It was Williams, the lead investigator, who interviewed the victims and produced the photo lineup where Hicks identified Stewart.

¶31. In *Willis v. State*, 352 So. 3d 602, 614 (¶31) (Miss. 2022), the supreme court explained:

> "This Court has recognized that Confrontation-Clause violations are subject to harmless-error analysis." *Conners* [*v. State*], 92 So. 3d [676,] 684 [(¶31) (Miss. 2022)] (citing *Corbin v. State*, 74 So. 3d 333, 338 (Miss. 2011)). "The well-settled standard for determining whether a constitutional error is harmless is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Ambrose* [*v. State*], 254 So. 3d

15

[77,] 105 [(¶70) (Miss. 2018)] (internal quotation mark omitted) (quoting *Gillett v. State*, 148 So. 3d 260, 266 [(¶17)] (Miss. 2014)).

While allowing Roberts to testify remotely violated the Confrontation Clause, we find "beyond a reasonable doubt" that Roberts' testimony "did not contribute to the verdict obtained." We affirm Stewart's convictions and sentences.

¶32. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY AND WEDDLE, JJ., CONCUR. BARNES, C.J., AND LAWRENCE, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. ST. PÉ, J., NOT PARTICIPATING.**